**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Ronald BURKET, Defendant-Appellant.**
**No. 930, Docket 72-2356.**

United States Court of Appeals,
Second Circuit.

Argued May 31, 1973.

Decided June 22, 1973.

Thomas P. Flaherty, Buffalo, N. Y.,
for defendant-appellant.

Roger P. Williams, Asst. U. S. Atty. (John T. Elfvin, U. S. Atty., W. D. N. Y., of counsel), for plaintiff-appellee.

Before MOORE, FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

Appellant Ronald Burket, along with Terry Davis, Theodore Bortz and Ferdinand Santana, were charged in a four count indictment in the District Court for the Western District of New York with conspiring to violate 18 U.S.C. § 2113 and with three susbtantive violations of that section as a result of armed robbery of a bank in Buffalo, N. Y., on May 18, 1972. On the government's motion the trial of Burket and Santana was severed from that of Davis and Bortz.[1] At the close of the government's case, the court granted a motion for acquittal of Santana.[2] The jury found Burket guilty on the conspiracy count and on two substantive counts but acquitted him on a count charging the taking of money by use of dangerous weapons in violation of 18 U.S.C. § 2113(d).

The testimony of bank employees was this: Four masked men entered the bank on the morning of May 18. Two, who were armed, kept the employees at bay while the others rifled the cash drawers. One of the latter wore a blue denim jacket, blue jeans, brown scuffed boots and a yellow-brown shirt-like head covering; the other wore a blue knit ski cap. One of the armed men, wearing a white pillow case type head covering, was later identified by a teller as Bortz.

At the time of the entry, branch manager Blarr was telephoning his wife. He was ordered by one of the robbers to hang up, but Mrs. Blarr apparently alerted the Buffalo police, who shortly arrived on the scene. They found four men running away, and gave chase. One man dropped a blue knit ski cap which

an officer retrieved, was later caught, and was identified as Terry Davis. Bortz was also apprehended. Pursuit of a third man, appellant Burket, resulted in his capture; he was wearing a blue denim jacket, dungaree pants and brown scuffed boots. A yellow-brown shirt was found on the sidewalk next to a 1970 gold Buick auto parked adjacent to the bank. The car contained boxes and bait money from the bank, as well as two bags carried by the robbers who had worked the tellers' cages. The fourth man—Santana, on the government's theory—got away but was apprehended later in the day.

In light of this, and of the finding of a latent fingerprint of Burket on the getaway car, a reader might be excused for wondering what this appeal is all about. The answer is that, due apparently to inexperience, the prosecutor's conduct of the trial confessedly left much to be desired. The errors fall into three categories: (1) allowing the jury to consider exhibits not properly before them; (2) questioning Mrs. Bortz and Mrs. Davis, wives of the two codefendants whose trial had been severed, see fn. 1; and (3) producing as a witness the marshal who had been in charge of the jury.

(1) The exhibit material improperly submitted to the jury falls into three categories:

(a) The government had introduced in evidence the certificate of registration of a 1966 Buick owned by Davis which was found on the evening of the robbery in front of the premises where Santana lived; latent palm and fingerprints found on the car; and allegedly similar prints of Santana.

(b) Five descriptive tags, which had not been admitted into evidence, attached to pieces of clothing and

---

1. The government sought this because of its intention to call Mrs. Bortz and Mrs. Davis.

2. The government had evidently expected to establish Santana's complicity by the testimony of Mrs. Bortz and Mrs. Davis, but this endeavor aborted as explained below.

a clip of bullets that had been received in evidence.

(c) A photograph of Burket which had never been offered in evidence, although photographs of Bortz, Davis and Santana had been.

When this was brought to Judge Henderson's attention as the result of a request by the jury for a list of exhibits and subsequent discussion by counsel, the judge called for the exhibits and ordered the offending items removed. This took some time, and the jury reached a verdict before the exhibits were returned. With counsel in agreement, the judge then requested the jury to continue its deliberations with the proper exhibits. Fifteen minutes later the jury returned with its verdict.

■■ A sufficient answer to the attempt to secure reversal on this score might be that defense counsel was as responsible as the prosecutor for seeing to it that only proper exhibits were sent to the jury room. See Rumely v. United States, 293 F. 532, 557–558 (2 Cir.), cert. denied, 263 U.S. 713, 44 S.Ct. 38, 68 L.Ed. 520 (1923); United States v. Strassman, 241 F.2d 784, 786 (2 Cir. 1957) (Medina, J.); United States v. Yoppolo, 435 F.2d 625 (6 Cir. 1970); but see Osborne v. United States, 351 F.2d 111, 116 (8 Cir. 1965). Contrast United States v. Adams, 385 F.2d 548 (2 Cir. 1967), where defense counsel objected with vigor, but without success. Still we would not wish to affirm on this ground if we believed that Burket suffered substantial prejudice. But we do not. Judge Henderson had told the jury in the clearest terms that Santana was out of the case. While the jury had expressed its difficulty in distinguishing between the Santana and Burket fingerprint exhibits, it had an opportunity to view the Burket prints in isolation after the judge requested the jury to continue its deliberations. Since nothing was added to the evidence against Burket by the certificate of registration of the 1966 Buick, its presence in the jury room could hardly have had any prejudicial impact. The writing on the tags was simply a description of the objects and a notation where the officers had found them, to all of which the officers had testified; the tags did not represent "a neat condensation of the government's whole case against the defendant," United States v. Ware, 247 F.2d 698, 700 (7 Cir. 1957), quoted in United States v. Adams, *supra*, 385 F.2d at 550. The photograph of Burket was not a mug shot, as defense counsel alleges, nor were the photographs of the three other men. Its sole value to the prosecution was in depicting how Burket looked shortly after the robbery, before he changed his facial appearance. But the identification of Burket rested more on his clothing than on his face, which had been largely concealed by the shirt, and on his having been caught in hot pursuit, and the failure to offer this photograph in evidence, as the other three were, seems to have been a mere inadvertence which the judge could have allowed the prosecution to cure even after it had closed its case. See Neely v. United States, 300 F.2d 67, 75 (9 Cir.), cert. denied, 369 U.S. 864, 82 S.Ct. 1030, 8 L.Ed.2d 84 (1962); 6 Wigmore, Evidence §§ 1877, 1880 (3d ed. 1940). We trust, however, that both prosecutors and defense counsel will take their responsibilities with respect to the transmission of exhibits to the jury more seriously than was done here.

■■ (2) The defense's first claim with respect to the examination of Mrs. Bortz and Mrs. Davis is that the government called them although knowing that they would refuse to testify on the ground of self-incrimination. Such action has been held to be error, United States v. Maloney, 262 F.2d 535 (2 Cir. 1959), although not necessarily calling for reversal, Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), either on the theory that the government is guilty of prosecutorial misconduct by seeking to build its case out of an inference from invocation of the privilege or on the view that the defendant is unfairly prejudiced by inabil-

ity to cross-examine. See Namet v. United States, *supra,* 373 U.S. at 186–187, 83 S.Ct. 1151, 10 L.Ed.2d 278. The short answer to all this in the instant case is that, having learned that the two ladies would refuse to testify unless granted immunity, the prosecutor obtained this and was then advised by their attorneys that they would testify, although not as the prosecutor might anticipate from statements they had given to agents of the FBI shortly after the robbery. This did not make it improper for the prosecutor to call them, see what they would actually do under the sanctity of the oath, compare United States v. Fiore, 443 F.2d 112 (2 Cir. 1971), and, if necessary, confront them with their previous statements to refresh their memory or, if that failed, to impeach them. See United States v. Graham, 102 F.2d 436 (2 Cir.), cert. denied, 307 U.S. 643, 59 S.Ct. 1041, 83 L.Ed. 1524 (1939); Stevens v. United States, 256 F.2d 619, 622–623 (9 Cir. 1958); United States v. Kahaner, 317 F.2d 459, 473–474 (2 Cir.), cert. denied, Corallo v. United States, 375 U.S. 835, 836, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963); Goings v. United States, 377 F.2d 753 (8 Cir. 1967); McCormick, Evidence § 38, at 77 & n. 78 (Cleary ed. 1972). Such error as there may have been lay in the prosecutor's endeavor to short-cut "the judicially sanctioned ritual," see United States v. Kahaner, *supra,* 317 F.2d at 474, of first endeavoring to refresh the ladies' recollection of each matter with the relevant passage of their statements to the FBI agents, then asking whether they had said what was reported and, if this was denied, calling the agents to complete the impeachment. See McCormick, Evidence, *supra,* § 37, at 72–73. Instead, his method of interrogation in effect placed the statements directly before the jury. But any mistake was fully cured by the judge's speedy and strong instructions that the jury was not to consider the statements to the FBI agents for any purpose other than as affecting the witnesses' credibility and specifically not as evidence of the defendants' guilt.

(3) Deputy Marshal Robinson, who had been in charge of the jury during the trial, was called by the government, rather late in the case, to testify that on the day of the robbery he had taken the fingerprints of Burket and Santana and had turned them over to a secretary to fill in the names and other facts. He identified the cards bearing the fingerprints, which an expert witness then compared with those removed from the getaway car in Burket's case and from the Davis car in Santana's. The defense attack is two-pronged. The first is that, at the beginning of the trial, the court, at the defense's request, had imposed "the rule" excluding all prospective witnesses; the other is that the marshal's relations with the jury gave his testimony undue weight.

■■ The first objection is frivolous. The purpose of imposing "the rule" in this case was to prevent identifying witnesses, including the police officers, from coordinating their stories. Nothing that Marshal Robinson had heard could affect his recollection, undisputed by anyone, that he had taken Burket's fingerprints. On the second point, it was most careless of the Assistant United States Attorney not to have arranged for a different marshal to shepherd the jury. Although the prosecutor represented to us that he made an unsuccessful effort to that end with the chief marshal, he should have carried the matter to the judge, who, we are certain, would promptly have handled the problem, as he did, with his usual efficiency, after it finally came to his attention. There is no intimation that here, as in Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966), the marshal expressed any views on the merits of the case to the jury. Still, if Marshal Robinson had testified to anything over which there was any controversy, we might have considered reversal in the exercise of our supervisory power despite contrary authority, see 6 Wigmore, Evidence, *supra,* § 1912, at 608 n. 4, because of the importance that justice not only shall be done but shall seem to have been.

But here there was no controversy at all. The only question asked of Robinson by the defense was whether he had used a special kind of ink, to which he answered that he had used a regular fingerprint pad, and the prints were received in evidence without objection. Again, while such prosecutorial conduct as this should not be repeated we see no justification for ordering a new trial.

Affirmed.