IN RE WILLIAM FERNANDEZ, IN PROCEEDINGS BEFORE A ONE-MAN GRAND JURY

SUPERIOR COURT       NEW HAVEN COUNTY       FILE NO. 19569

Memorandum filed May 14, 1974

*Goldman, Melnick & Williams,* of New Haven, for the defendant Fernandez.

*Michael Dearington,* assistant state's attorney, for the state.

SADEN, J.   It seems from statements of counsel that William Fernandez, hereinafter called the defendant, has appeared before a one-man investigatory grand jury (*O'Sullivan,* state referee) inquiring into whether there has been committed any violations of the election laws with reference to absentee balloting.   When called as a witness, the defendant refused to answer a series of questions put to him, claiming the fifth amendment privilege against self-incrimination.   A footnote includes all of the questions.[1]   Some of them the defendant is now willing to answer.   They are Nos. 1, 2, 3, 4, 19, 23, 28, 30, 31, and 32.

---

[1] "(1) Do you own or have any property interest in either No. 36 or No. 38 Kossuth Street?   (2) Did you vote in the past election, that is November 6, 1973?   (3) Are you a registered voter in the city of New Haven?   (4) Did you have occasion to vote by absentee ballot in this past election?   (5) Did you have occasion to apply for an absentee ballot by filling out applications in the name of registered voters and putting your mailing address as 84 Daggett Street on the applications?   (6) Did you fill out any applications for absentee ballots showing a mailing address of 84 Daggett Street, New Haven?   (7) Do you have any explanation or account for these eighty-five applications showing 84 Daggett Street as a mailing address?   (8) I show you exhibit 37, thirty-five applications for absentee ballots, showing 38 Kossuth Street as a mailing address. Do you have any information on that?   (9) Exhibit 36, forty-six applications for absentee ballots showing mailing address of 36 Kossuth Street.   Did you fill any of these out?   Do you have any information on who fills these out?   (10) Were you authorized by any registered voter in the city of New Haven in this past election to apply for applications for absentee ballots?   (11) Are you a member of the Democratic party?   (12) Are you the ward chairman for the fourth ward?   (13) On the day of the election, on November 6, 1973, did you have occasion to be at a Vernon Street address in the city of New Haven?   (14) Did you have occasion to talk to a Bobby Green with reference to an elector voting at the Welch Street School?   (15) Do you know Richard Green?   (16) Did you, in this past election, tell anyone they could not vote?   (17) While at the Vernon

## I

The federal rule with reference to the privilege against self-incrimination—the rule which governs this case because a fifth amendment right is involved —is perhaps best stated in *Hoffman* v. *United States,* 341 U.S. 479, and *Malloy* v. *Hogan,* 378 U.S. 1. The defendant in *Hoffman* had a twenty-year police record and had been publicly labeled an "underworld character and racketeer." *Hoffman* v. *United States,* supra, 489. The Senate crime investigating committee had placed his name on a list of "known gangsters," and police had described him as "the king of the shore rackets who lives by the gun." Ibid. He had also served a sentence on a narcotics charge. Ibid. The court in *Hoffman* stated (p. 486): "The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise

---

Street address, did you have occasion to call someone for instructions as to whether to allow certain people to vote? (18) If you did make such a call, who did you talk to? (19) Referring to exhibit 2, is that a picture of yourself? (20) Incident to this past election, did you have occasion to hand carry a number of absentee ballots in a mailing envelope from a Democratic headquarters to any other headquarters, to the town clerk's office? (21) If you did so do, to whom did you give them to at the town clerk's office? (22) If you did so do, whom did you receive them from? (23) Do you know Gumpy DelRio? (24) Did he ask you to assist the Democratic party in the past election? (25) Have you ever been approached by anyone to violate the election laws of this state? (26) If you were so approached, by whom were you approached? (27) Did anyone at your home, in your family, ever vote by absentee ballot in the past election? (28) Do you know of anyone who voted at the No. 36 or No. 38 Kossuth Street address by absentee ballot in the past election? (29) Is Ramona Fernandez your sister? (30) Are you employed by the city of New Haven? (31) If so employed, how did you obtain your job? (32) Was it through Gumpy DelRio? (33) Do you know of anyone who may have violated the laws of the state of Connecticut pertaining to this election, in the past election or any other election?" Also, the defendant was asked, "Are you willing to submit to a handwriting exemplar for the purpose of this grand jury proceeding?" Counsel for the defendant stated "Objection," and further stated, "[H]e would not."

embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. *(Patricia) Blau* v. *United States,* 340 U.S. 159 (1950). But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. *Mason* v. *United States,* 244 U.S. 362, 365 (1917), and cases cited. The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, *Rogers* v. *United States,* 340 U.S. 367 (1951), and to require him to answer if 'it clearly appears to the court that he is mistaken.' *Temple* v. *Commonwealth,* 75 Va. 892, 899 (1881). However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' See Taft, J., in *Ex parte Irvine,* 74 F. 954, 960 . . . ."

The trial judge in *Hoffman* was aware (p. 487) that the special grand jury which examined Hoffman was investigating "rackets" in Philadelphia that would "run the gamut of all crimes covered by the federal statute." Three of the questions put to Hoffman were designed to draw information

as to his contacts and connection with a fugitive witness, Weisberg, and a final question inquired as to the whereabouts of the fugitive witness at the time. "All of them could easily have required answers that would forge links in a chain of facts imperiling petitioner with conviction of a federal crime. The three questions, if answered affirmatively, would establish contacts between petitioner and Weisberg during the crucial period when the latter was eluding the grand jury; and in the context of these inquiries the last question might well have called for disclosure that Weisberg was hiding away on petitioner's premises or with his assistance. Petitioner could reasonably have sensed the peril of prosecution for federal offenses ranging from obstruction to conspiracy. In this setting it was not *'perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] cannot possibly have such tendency'* to incriminate. *Temple* v. *Commonwealth,* 75 Va. 892, 898 (1881), cited with approval in *Counselman* v. *Hitchcock,* 142 U.S. 547, 579–580 (1892). See also, *Arndstein* v. *McCarthy,* 254 U.S. 71 (1920)." *Hoffman* v. *United States,* supra, 488.

Thus in essence the federal rule is that if it is not *"perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken [in claiming his privilege], and that the answer[s] cannot possibly have such tendency"* to incriminate, the witness need not answer the question. This includes a question the answer to which might forge a link in the chain of evidence to prosecute the witness for a crime. Furthermore, the claim of privilege does not require the witness to prove the hazard because this could lead to the surrender of the very protection which the privilege is designed to guarantee.

Special federal grand juries now operate under the Special Grand Jury Act; 84 Stat. 923, 18 U.S.C. § 3331 (1970); and have the right to subpoena witnesses and documentary evidence and objects. Fed. R. Crim. P. 17 (a), (c); see 84 Stat. 926, 18 U.S.C. § 3334 (1970) (which makes the Federal Rules of Criminal Procedure applicable to special federal grand juries). Under Connecticut law; General Statutes § 54-47; the right to subpoena witnesses and to the production of documents before a one-man grand jury is specifically granted.

In order to determine whether the defendant is in contempt, it is necessary to determine whether any of the questions asked should have been answered after a fifth amendment claim was made. If a question is improper, it need not be answered and no contempt would thus be created. Because a finding of contempt means incarceration, the court must consider each question anew to decide the basic issue.

In the present case the court gleans from what counsel has indicated that the defendant is a potential accused rather than a mere witness. He was represented by counsel pursuant to General Statutes § 54-47 (c). The United States Court of Appeals, Second Circuit, in 1965 refused to restrict the prosecutor's right to call a prospective accused before a grand jury; *United States* v. *Winter*, 348 F.2d 204, 207, cert. denied, 382 U.S. 955; although in 1955 the same court presumed that "as a matter of ethics or fair play or policy, a prosecutor would in all cases refrain from calling as a witness before a Grand Jury any person who is *de jure* or *de facto* an accused." *United States* v. *Scully*, 225 F.2d 113, 116, cert. denied, 350 U.S. 897. The court went on to observe (p. 116) that the "absence of appeals to

this court involving the problem . . . would seem to indicate that some such rule or practice is observed in the prosecutors' offices in this circuit."[2]

There are of course differences between the federal special grand jury and the Connecticut one-man grand jury. The former appears to have greater powers than the latter. It can both investigate and indict, and in the process may file reports. *United States* v. *Ceccerelli,* 84 Stat. 923–26, 18 U.S.C. §§ 3331–3334 (1970); 350 F. Sup. 475, 479. The Connecticut one-man grand jury cannot indict; it

---

[2] The text of Moore, Federal Practice, makes this comment on the Second Circuit and other courts: "Whether or not the court's inference was correct as of 1955, at the present time it seems to be the invariable custom in the Southern District of New York (where more grand juries are in session than in any other district) to subpoena the prospective defendant. Yet the Second Circuit flatly dismisses any argument in favor of immunity and does not even acknowledge the existence of an ethical problem, as it once did in . . . [*United States* v. *Scully,* 225 F.2d 113, 116]. And other courts are equally insensitive to the issues at stake here. In this respect criminal procedure seems to have come full circle with the Inquisition now legitimatized." 8 Moore, Federal Practice (2d Ed.) —Cipes, Criminal Rules ¶ 6.06 [1] p. 6-70.

The issue in all cases where a potential defendant is summoned before any kind of grand jury either to testify or to produce documents is not without interest. If a potential defendant who is asked in an investigatory grand jury proceeding questions the answer to which may incriminate him invokes the privilege under the fifth amendment, the grand jury may draw adverse inferences, even though this would be legally improper. See 8 Moore, op. cit. ¶ 6.06 [1], p. 6–69, and the concurring opinion of four justices in *Grunewald* v. *United States,* 353 U.S. 391, 425, where they point out: "The value of constitutional privileges is largely destroyed if persons can be penalized for relying on them. It seems peculiarly incongruous and indefensible for courts which exist and act only under the Constitution to draw inferences of lack of honesty from invocation of a privilege deemed worthy of enshrinement in the Constitution."

Thus the question of "ethics or fair play or policy" mentioned in *United States* v. *Scully,* 225 F.2d 113, 116, may not always be given "[s]hort shrift" as was done in *United States* v. *Winter,* 348 F.2d 204, 207, and, in some instances before an investigatory grand jury where a prosecutor knows in advance that some of the questions

can only report. General Statutes § 54-47 (c). Thus the questioning of a potential defendant before a special federal grand jury does not present a situation any different from that before a regular grand jury. The Connecticut one-man grand jury does, however, differ because it leads only to a report. Nevertheless it is conceivable that such a report can be colored by a conscious and flagrant attempt to build the state's case out of inferences arising from

---

he intends to put to a potential defendant may be incriminating, he probably should not ask those questions. · Otherwise he forces the defendant to claim his privilege against self-incrimination, from which prejudicial inferences may be drawn.

The mere asking of such questions of a witness in a criminal trial can under some circumstances be prejudicial to the defendant where the prosecutor knows in advance that the witness intends to claim his privilege and refuse to testify. *Fletcher* v. *United States,* 332 F.2d 724, 726 (where the court outlines the circumstances justifying a reversal of a conviction). Inferences from a witness' refusal to answer can sometimes add critical weight to the prosecution's case. See *Douglas* v. *Alabama,* 380 U.S. 415, 420; *United States* v. *Maloney,* 262 F.2d 535, 536. The concept of prosecutorial misconduct in a trial where the government makes a conscious and flagrant attempt to build its case out of inferences arising from the use of testimonial privilege has been recognized by a number of courts. *United States* v. *Maloney,* supra. Another theory rests upon the conclusion that, under the circumstances of the given case, critical weight may be added to the prosecution's case based on inferences drawn from use of the testimonial privilege in a form not subject to cross-examination, thus unfairly prejudicing the defendant. Ibid. The United States Supreme Court has not passed on the correctness of either theory to date. *Namet* v. *United States,* 373 U.S. 179, 187.

The point is, how far should the prosecution go, or be allowed to go, in any investigatory proceeding seeking evidence, whether oral or in documentary form, when the prosecution has substantial reason to believe in advance that the information being sought will tend to incriminate the potential defendant and thus force him to exercise his fifth amendment privilege in the presence of the investigating grand jury? Is there in truth a moral, ethical, fair play, or policy question involved, as was suggested in *United States* v. *Scully,* supra, which should be self-actuated by the prosecutor and grand jury investigating the matter so as to prevent such questions from ever being asked, or potentially incriminating documentary information from being sought? Or is the question purely one of exercising the "option of refusal, not a prohibition of inquiry"? 8 Wigmore, Evidence (McNaughton Rev. 1961) § 2268.

the use of testimonial privilege. See *Fletcher* v. *United States,* 332 F.2d 724; *United States* v. *Maloney,* 262 F.2d 535.

This issue has not, however, been raised by the defendant, nor is there anything in the record before the court that would indicate that the conditions found in *Maloney* and *Fletcher* exist here. The claimed privilege must therefore be judged solely as to each question asked, in the light of the federal rule set forth in *Hoffman* v. *United States,* 341 U.S. 479, and *Malloy* v. *Hogan,* 378 U.S. 1. If it is "evident from the implications of the question, in the setting in which it . . . [was] asked, that a responsive answer to the question or an explanation of why it . . . [could not] be answered might be dangerous because injurious disclosure could result," the question need not be answered. *Hoffman* v. *United States,* supra, 486.

The court rules as follows as to each numbered question: (5) objection sustained; (6) objection sustained; (7) objection sustained; (8) objection sustained; (9) objection sustained; (10) objection sustained; (11) objection overruled; (12) objection overruled; (13) objection overruled; (14) objection sustained; (15) objection overruled; (16) objection sustained; (17) objection sustained; (18) objection sustained; (20) objection sustained; (21) objection sustained; (22) objection sustained; (24) objection overruled; (25) objection sustained; (26) objection sustained; (27) objection overruled; (29) objection overruled; (33) objection sustained.

In making the above determinations, the court has had little before it except the record on file and brief statements of counsel which do not disclose

the detailed background of this matter. There is, however, sufficient information to rule on the questions, and, giving the defendant the benefit of every doubt, it appears that he should have answered questions 11, 12, 13, 15, 24, 27, and 29, in addition to the questions he has now agreed to answer. To this extent he is found in contempt of court as to these questions.

## II

The sole remaining issue concerns the request to the defendant before the one-man grand jury to submit certain handwriting exemplars, which he refused to do, claiming his privilege against self-incrimination. The recent cases of *United States* v. *Dionisio,* 410 U.S. 1, dealing with voice exemplars, and *United States* v. *Mara,* 410 U.S. 19, dealing with handwriting exemplars, preempt the issue raised by the defendant and clearly establish that the fifth amendment does not protect a witness before a grand jury from submitting handwriting exemplars. In these cases the defendants were informed that they were potential defendants in a criminal prosecution. The court stated in *Dionisio* (p. 5) that requiring the display of identifiable physical characteristics infringes no interest protected by the fifth amendment because it does not involve any physical or moral compulsion to extort communications. The same is true of a blood sample. *Schmerber* v. *California,* 384 U.S. 757, 764. A handwriting exemplar, in contrast to the content of what is written, is an identifying physical characteristic outside the protection of the fifth amendment.

Furthermore, the fourth amendment does not bar handwriting exemplars on the grounds of a lawless governmental intrusion upon the privacy of "persons." It protects people, but not places. Only when (1) there has been a "seizure" of the person

necessary to bring him into contact with government agents and (2) a subsequent search for and seizure of the evidence, is there a fourth amendment violation. The compulsory production of exemplars from a grand jury witness turns on the same dual considerations, i.e. whether the initial compulsion to appear before the grand jury or the subsequent directive to provide handwriting exemplars was an unreasonable "seizure" within the fourth amendment.

The compulsion to appear before the grand jury is not a "seizure," and the directive to provide handwriting exemplars, which are constantly exposed to public view, is no infringement of the defendant's rights under the fourth amendment. Hence, absent any protected fourth amendment interest, there is no requirement that the grand jury satisfy even minimal requirements of "reasonableness," and therefore no necessity for a preliminary showing of reasonableness. *United States* v. *Dionisio,* supra, 8, 13–15.

The defendant would have this court overrule these decisions of the United States Supreme Court but offers no authority for such a course of action except the assertion that they are wrong and therefore this court should "start the ball rolling right here" to prove this true. The court is flattered with counsel's suggestion that it has such power, but it fears the day has not yet arrived when the Superior Court of the state of Connecticut can overrule the United States Supreme Court. Furthermore, this court is of the opinion that it is not very likely such a day will ever arrive in the near or distant future. Although the court differs with the defendant's appraisal of the *Dionisio* and *Mara* cases, supra, it must also concede that the United States Supreme

Court is not always right and has had to overrule itself in a number of instances over the years.[3]

In the light of *Dionisio* and *Mara,* the defendant was in contempt of the one-man grand jury in refusing to provide handwriting exemplars.

## III

Punishment for the contempt here evidenced falls within General Statutes § 51-35, providing for confinement in a community correctional center at the recalcitrant witness' own expense "until he so testifies." Obviously, the proper procedure is to find the defendant in contempt of court to the extent set forth with reference to the allowed questions and handwriting exemplars mentioned in this memorandum, in addition to the questions he has now agreed to answer; to sentence him to the custody of the commissioner of correction for confinement at the New Haven community correctional center· at his own expense until he complies with the order of this court set forth herein; and to delay the inception of the sentence until such time as the one-man grand jury is reconvened and the defendant is summoned as a witness, at which time, if he fails to answer any of the questions allowed by this court or to provide the handwriting exemplars requested by the state, the sentence shall at once begin.

It is so ordered.

---

[3] A classic example is the celebrated case of *Palko* v. *Connecticut,* 302 U.S. 319, where in 1937 the Supreme Court ruled that the double jeopardy provision of the fifth amendment was not binding upon the states through the due process clause of the fourteenth amendment, and then thirty-two years later, in 1969, reversed the *Palko* holding by its decision in *Benton* v. *Maryland,* 395 U.S. 784, 794. It was, of course, a great satisfaction to Palko's counsel to learn in 1969 that their argument, made thirty-two years earlier, was finally acknowledged to be correct by the court, but small satisfaction to their client, who long since had been electrocuted.