## Paul MOYNAHAN

v.

## John R. MANSON, Commissioner of Correction of the State of Connecticut.

### Civil No. H–218.

United States District Court,
D. Connecticut.

Aug. 31, 1976.

---

Edward F. Hennessey, III, Robinson, Robinson & Cole, Hartford, Conn., for petitioner.

Jerrold H. Barnett, Asst. State's Atty., Woodbridge, Conn., for respondent.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

▌ The petitioner, Paul Moynahan, onetime Deputy Police Superintendent of the City of Waterbury, Connecticut, was convicted on February 4, 1970, after a jury trial, of the crime of receiving stolen goods.[1] The conviction was affirmed by the Connecticut Supreme Court. *State v. Moynahan*, 164 Conn. 560, 325 A.2d 199, *cert. denied*, 414 U.S. 976, 94 S.Ct. 291, 38 L.Ed.2d 219 (1973). He now seeks a writ of habeas corpus. Jurisdiction exists in this court pursuant to 28 U.S.C. §§ 2241, 2254.[2]

### I. The Petitioner's Claims

The State accused the petitioner of having received a stolen twenty-two inch Motorola color television console from one Charles Vernale, known to the police in the Waterbury area as a dealer in stolen property. At trial, the prosecution was able to produce the affirmative evidence of only two witnesses; John Bishop, a convicted thief, who testified that the television set in question was one of many he had stolen in the course of several burglaries of appliance stores and that he helped Vernale deliver it to the petitioner's home;[3] and Edward Miller, a Waterbury television repairman, who identified the stolen television set, which had been found abandoned in a field, as one which he had earlier repaired in the home of the petitioner. Vernale was also called to the stand by the prosecutor, but he invoked the fifth amendment.[4] Finally, the State offered impeachment of the petitioner's denials.

Petitioner raises nine separate challenges to the conduct of his trial, which he alleges are of constitutional magnitude.[5] Of these, three merit extended discussion.

### II. The Right-to-Confrontation Claim

#### A. On Its Merits

The most damaging testimony[6] against the petitioner was that given by the television repairman, Edward Miller. Mr. Miller testified that, although he had never previously met the petitioner, Mr. Moynahan had called him at home on a Sunday morning and had asked him to come to his home to repair his television set which was without sound.

---

1. In violation of Conn.Gen.Stat.Ann. §§ 53–63, 53–65 (1960).

2. The petitioner is currently free on bond, pending the outcome of this action. This does not, of course, affect this court's jurisdiction. *See Hensley v. Municipal Court*, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973).

3. Bishop's identification of the television is weakened by prior statements where he stated that the set in question "looked like" the one he had stolen. These statements were not released to the defense. *See* note 22 *infra*. Bishop also connected the petitioner to Vernale, testifying that he had seen and spoken to him at Vernale's home. Petitioner did not deny this, but claimed that Vernale had served him as a source of information.

4. *See* IV *infra*.

5. A tenth claim, that of ineffective assistance of counsel has been foretold if this court should refuse to pass on the denial of cross-examination claim. This claim has not been formally raised, and needless to say, has not been presented to the state courts. *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). As to the nine original claims, the State concedes exhaustion.

6. The only other witness who actually placed the set in the petitioner's home was the admitted thief, Bishop. He gave a statement to the police and testified before the grand jury that the set delivered to Moynahan was "probably" an R.C.A. color console. At trial he testified that it was a twenty-three inch, Early American

Miller testified that he had gone to the petitioner's home and had discovered that the sound coil, which was enclosed in a box in the set's chassis, was broken. He further testified that he had repaired the set in the petitioner's home by opening the metal box, removing the coil, soldering the broken wire, covering the wire with electrical tape to hold it in place, and then reassembling the set, finishing the repair by soldering the metal box. For this work, he testified, the petitioner paid him $15.

He further testified that sometime later, after the State Police had found the set smashed and abandoned in a field, he had been able to identify it by the solder marks on the box, and that he had been present when the State Police opened the box and confirmed the presence of the electrical tape.

Petitioner claims that he was deprived of his sixth and fourteenth amendment rights to confront the witnesses against him by the refusal of the trial judge to allow him to impeach Miller's testimony by showing that Miller, himself, was a member of the stolen-goods ring[7] along with John Bishop and Vernale, and therefore had a strong personal interest in falsifying his testimony. Petitioner claimed that Miller's involvement served both to lend credence to a theory that the petitioner was being "framed" by the two witnesses, and to make Miller vulnerable to pressure from the police and prosecutors to force him to alter or color his testimony.

Petitioner claims that Miller was in fact an outlet for stolen television sets, i.e., that

he sold sets which he obtained from Vernale and that when repair work had to be done on sets which Vernale had sold, it was done by Miller. Petitioner attempted to present this evidence to the jury in two ways, through cross-examination of Miller himself, and through the testimony of two witnesses who would testify that they had purchased sets from Miller at unusually low prices, and that the sets had turned out to have been stolen. In both instances the trial judge rejected the offers of proof, ruling that the issues raised were collateral. While the judge allowed Miller to be examined to a limited extent concerning sales of sets which he had obtained from Vernale, in order to challenge his identification of the specific set he claimed to have repaired in the petitioner's home, he refused to allow the questioning to be expanded to show Miller's general business practices, and the obvious inference that they were dishonest and inferably in aid of a stolen radio and television ring.[8]

To the extent that the petitioner was not allowed to cross-examine Miller concerning his alleged criminal involvement, this case is governed by *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).[9] In that decision, the Supreme Court held that it was constitutional error to deny a defendant the right to develop before the jury the fact that a witness had himself been a suspect in the crime alleged, and therefore had a peculiar vulnerability to police pressure. The Court stated:

"We cannot accept the Alaska Supreme Court's conclusion that the cross-exami-

style Motorola stolen from a different store at a different time. On cross-examination Bishop was shown to have made a number of prior inconsistent statements. Miller's importance was acknowledged by the State in its closing argument. See Tr. 1970–72, Exhibit 10 to Defendant's Return.

**7.** The existence of an extensive burglary and stolen-goods ring was brought out at trial by the State through the testimony of Captain Wayne Bishop of the State Police. Tr. 646–47, Exhibit 5 to Defendant's Return.

**8.** Tr. 496–502, Exhibit 6 to Defendant's Return.

**9.** It is only fair to emphasize that *Davis* was decided after the petitioner's conviction had

been affirmed, and that the trial court therefore did not have the advantage of its guidance. This is especially important since a review of the transcript clearly shows that the trial judge was extremely willing to provide the petitioner with every right which the case law, as it had been developed at that time, made clear was his due. Nevertheless, it cannot be said that the *Davis* decision significantly expanded or created a new constitutional right, i.e., one which might not be cognizable in a habeas proceeding. *Chesney v. Robinson*, 403 F.Supp. 306, 311 n. 10 (D.Conn.1975), cert. den., —— U.S. ——, 97 S.Ct. 177, 50 L.Ed.2d 147 (1976).

nation that was permitted defense counsel was adequate to develop the issue of bias properly to the jury. While counsel was permitted to ask Green *whether* he was biased, counsel was unable to make a record from which to argue *why* Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial. On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness or, as the prosecutor's objection put it, a 'rehash' of prior cross-examination. On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury those facts from which jurors, as the sole triers of fact and credibility could appropriately draw inferences relating to the reliability of the witness."

415 U.S. at 318, 94 S.Ct. at 111.

■ Here, as in *Davis*, the petitioner was not allowed to cross-examine an important prosecution witness concerning his possible bias due to his involvement, or suspected involvement, in the same criminal scheme, and therefore was deprived of essential constitutional rights. And while *Davis* holds that, given these circumstances, no showing of prejudice is necessary, 415 U.S. at 318, 94 S.Ct. 1105, quoting *Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), it is clear that the State capitalized on the defense's inability to show Miller's involvement. In his rebuttal argument, the prosecutor was able to argue:

"Why shouldn't you believe Miller? I will tell you why you should believe him. He had no axe to grind in this case. . . .

"Why does he do a thing like that? Is there some kind of inference in the background here that the Connecticut State Police got him to do it? There has been no evidence of that, not a shred of evidence of that."

Tr. 1970–71, Exhibit 10 to Defendant's Return.[10]

While this denial of cross-examination was in itself error of constitutional magnitude, the error was compounded when the defendant was prohibited from calling two additional witnesses, Stevens and Gaspari, to testify concerning the circumstances under which they purchased televisions from Miller which later proved to have been stolen.

■ It is clear that, as a matter of evidence, when attempting to show bias or interest, as opposed to bad reputation, the examiner is not bound to accept the witness' answer, but is free to call additional witnesses for impeachment. McCormick, *Evidence* § 40 at 81 (2d ed. 1972). And while the right to call additional witnesses was not at issue in *Davis*, it does fit into the phrase "to expose to the jury those facts from which [they] . . . could appropriately draw inferences . . .," and the denial of this right was likewise a denial of the sixth amendment right of confrontation. *Johnson v. Brewer*, 521 F.2d 556 (8th Cir. 1975).

## B. *Waiver*

■ Although the petitioner raised the issue of denial of cross-examination on appeal, the Connecticut Supreme Court refused to rule on it, holding that it had been abandoned.[11] Petitioner seeks to challenge that determination here.[12]

---

**10.** This argument borders on the unconscionable considering the prosecution's knowledge of Miller's involvement. *See* III *infra*.

**11.** "The line of inquiry which the defendant claims he was not allowed to follow was intentionally abandoned after Miller had been questioned in the absence of the jury, and therefore the claim that cross-examination

was unduly restricted is utterly without merit."

*State v. Moynahan*, 164 Conn. 560, 588, 325 A.2d 199 (1973). This holding applied only to the denial of cross-examination of Miller, the court expressly affirmed the decision to exclude the extrinsic impeachment testimony of Stevens and Gaspari.

**12.** While waiver is a mixed question of law and fact, and therefore is arguably subject to the

■ An examination of the transcript[13] convinces me that the conclusion of the Connecticut Supreme Court is not fairly supported by the record. 28 U.S.C. § 2254(d)(8).

After an in-chambers discussion concerning the permissible scope of petitioner's cross-examination,[14] the trial judge allowed the petitioner's attorney to question Miller in a "dry-run" out of the presence of the jury.[15] The questions asked were to serve as an offer of proof in the event that the judge held the answers inadmissible. Objections were made by the prosecution to almost all of the questions. The judge sustained some objections but rejected others.[16] At the end of the offer, the judge ruled that all the questions which he had allowed could be read to the jury. Both sides objected to this proposal, at which time the following colloquy occurred:

"MR. HENNESSEY: May this line of inquiry, your Honor, be considered as an offer of proof in the absence of the jury?

"THE COURT: Yes, and I would suggest that the best way of handling this would be in the presence of the jury, to have the reporter read the questions and the answers to the jury, and have the questions and answers appear before them rather than have you repeat them again.

"MR. HENNESSEY: Well, I didn't want to ask the questions in their presence.

   \*    \*    \*    \*    \*    \*

"MR. GAFFNEY [the prosecutor]: You know, I would just quarrel with this procedure, your Honor, because I think this is the reason we did it in the absence of the jury.

\*    \*    \*    \*    \*    \*

"MR. GAFFNEY: I would object to the procedure recommended by the Court.

\*    \*    \*    \*    \*    \*

"THE COURT: Your objection is well taken. I merely suggested it as a precaution so that the jury would not have before it anything which is improper, but if you object and your objection is sustained.

"MR. GAFFNEY: Thank you.

"MR. HENNESSEY: I won't go into this line of inquiry at all.

"THE COURT: Then that solves the whole problem.

"MR. HENNESSEY: But I would only ask that you permit me to have those portions, those questions which we have asked here be presented to the Court as an offer of proof.

"THE COURT: Any objection to that?

"MR. GAFFNEY: No objection.

"THE COURT: Very well. It is so ordered."

Tr. 564–66, Exhibit 6 to Defendant's Return.

I find it clear from this record that, having been denied the opportunity to develop the theory of bias due to criminal involvement, the defendant chose to rest on his offer of proof rather than to submit the individual preliminary questions which had been allowed to the jury. Holding this to be an abandonment of the claim of imper-

---

provisions of 28 U.S.C. § 2254(d), I am not precluded from reviewing the record to determine if there is factual support for the state court conclusion. § 2254(d)(8). *See Henry v. Mississippi*, 379 U.S. 443, 452–53, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965); *cf. LaVallee v. Delle Rose*, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973). *See also Douglas v. Alabama*, 380 U.S. 415, 421–22, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Wright v. Georgia*, 373 U.S. 284, 289–91, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963).

13. Mr. Miller's testimony is contained in Exhibit 6 to Defendant's Return.

14. The exact nature of the agreement reached in this discussion is not part of the record. It is a subject of dispute between the parties. I do not find it necessary to resolve the dispute.

15. This examination, which takes up eleven pages of transcript, 554–64, is simply too long to reproduce, despite its importance to the resolution of this matter.

16. Why the judge would not allow the questions to be answered out of the presence of the jury, as part of the offer of proof, is not clear.

missible curtailment of cross-examination was clearly without basis.

## III. *The* Brady *Claims*

The petitioner's second claim is that, despite a request for all exculpatory information in the possession of the prosecution, the State failed to timely deliver material which demonstrated Miller's criminal involvement and that he had been a target of the State Police investigation. This, the petitioner claims, violated his right to due process. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ At the outset it must be noted that, although the defense made a specific and lengthy request for exculpatory evidence, it did not request any material specifically concerning Mr. Miller. Therefore the standard this court must apply in weighing the petitioner's claim is to determine whether, had he been able to present the withheld evidence to the jury, it would have created a reasonable doubt that did not otherwise exist. *United States v. Agurs,* —— U.S. ——, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

The petitioner's claim focuses on two related areas of information which were available to the prosecution, the knowledge of Miller's criminal involvement which would have had a bearing on his state of mind, and the existence of an investigation, which would have been relevant to the issue of whether he had been threatened or promised reward by the authorities. The Connecticut Supreme Court denied the petitioner's appeal on this point because it held

that he had failed to prove the existence of any material which had been withheld.[17] *State v. Moynahan,* 164 Conn. 560, 592–93, 325 A.2d 199 (1973).

## A. *Miller's Criminal Involvement*

■ The material retained by the prosecution does contain numerous facts which support the theory that Miller was dealing in stolen televisions. However, this was a situation already known to the defense and one which they attempted diligently to argue to the court and the jury.[18] While there were many specific additional items of evidence which were unknown to them, I am not sure that any one of them, or even their combination, would have added appreciably to the defendant's argument. This additional information cannot, therefore, be said to be material under the standard set forth in *Agurs.* Therefore I do not find that the failure to divulge this information violated the petitioner's right to due process to such a degree that it is independently remediable in habeas corpus.

## B. *Miller's Vulnerability To Prosecutorial Influence*

While the petitioner's counsel had some awareness of Miller's criminal involvement, and while this does necessarily imply a certain vulnerability, *see e. g., Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), they were not able to confirm this inference with any factual material. Thus they were unable to contradict Miller when he testified under oath that no offers had

17. At trial the petitioner had once again requested all exculpatory evidence, especially as was contained in statements made by Mr. Miller to the police or the grand jury. The trial judge refused to examine these statements *in camera* and instead ordered the prosecution to turn over any exculpatory material. The prosecution complied with this order by selecting parts of the material it had and turning those parts over to the defense. The remainder was sealed for review on appeal. It was still sealed when delivered to this court in response to my order. Faced with the similar difficulty of re-

quiring the petitioner to prove that the retained material was, in fact, exculpatory, I ordered it released to the petitioner for the purpose of presenting this case.

18. The fact that the petitioner was not allowed to use the information in his possession to cross-examine Miller is not relevant in determining the materiality, under the *Agurs* standard, of the information withheld by the prosecutor. The *Brady* claim must be analyzed separately.

been made to him and that he had not been the subject of an investigation.[19] Further, they were unable to counter when the State affirmatively argued that no pressure had been brought to bear. *See* quote on p. 1143 *supra.*

An inspection of those portions of the transcript of the police interrogation which were not disclosed to petitioner's counsel leads to the inescapable conclusion that Miller was less than candid on this point, and that the prosecutors must have been aware of it.[20] This case is therefore similar to *Napue v. Illinois,* 360 U.S. 264, 269, [79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217] (1959). There the Supreme Court stated:

"The principle that a State may not knowingly use false evidence, including

false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."

It is not necessary for this court to find as a fact that the state prosecution knowingly abetted Miller in his false testimony, for in *Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), the Court extended the rule of *Napue* to

19. "Q. At the time you were first questioned by the police, Mr. Miller, were you told by any police that you were under investigation for anything?

\* \* \* \* \* \*

"A. No.

"Q. And at any subsequent time after that first inquiry were you told by any member of the police, or any member of the State's Attorney's office that you were under investigation?

\* \* \* \* \* \*

"A. No.

\* \* \* \* \* \*

"Q. Was any threat made to you that you would be arrested?

"A. No.

\* \* \* \* \* \*

"Q. At any time did anyone make any promise to you as to what might occur if you did testify?

"A. No, there was no promise.

"Q. Well, was there any conversation about it with anyone?

\* \* \* \* \* \*

"A. No, there was no conversation about that."

Tr. 555–57, Exhibit 6 to Defendant's Return.

20. The transcript of Miller's interview by State Police officers on February 18, 1969, clearly discloses that Miller was a subject of the investigation and that he was threatened with prosecution. One portion, which was not turned over to the defense, contains the following exchange:

"Q. Well, let me put it this way: If I had nothing to hide, I wouldn't be concerned, and it's very easy for me and anyone to tell the truth. It's when—

"A. Oh, I'm not trying to hide anything.

"Q. —you don't tell the truth—it's when you don't tell the truth and then you tell an untruth, and then before you know it you have to tell something else to cover that one and then before you know it you're in up to your ears. So, the best thing at this particular point is to come out with the truth, complete truth, get it all off your chest at once, and it's the end of it, and we go from there.

"Well, the point that I'm trying to make here, too, is that we've got two sets here that you've handled that are stolen, so *even if there were twenty-two sets, it isn't going to be any more difficult for twenty-two than it is for two.*

"*You follow me?*"

At 38–39 (emphasis added). Later a police officer stated:

"Q. And, so, this is the point that we're trying to make, Ed; we're just trying to get down to the basic facts in this thing, get it over with, *square away Ed Miller,* and then we can go on. *Otherwise, we're going to have to start looking at Ed Miller a little stronger.*

"*You follow me, Ed?*"

At 41 (emphasis added). And finally:

"Q. Yeh, I'm not talking about the north end of town. I'm talking, Ed, where you've known Charlie Vernale for a couple years, and you've known pretty much that Charlie's had an awful lot of stuff, he's handled an awful lot of stuff. He sold stuff to everybody in town, and *I'm sure that you've handled more than two sets from him.*

"*As I say, our information indicates this, Ed.* We're verifying information. This is what we are in the process of doing right now."

At 44 (emphasis added).

cover "suppression of material evidence . . . 'irrespective of the good faith or bad faith of the prosecution.'" *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ The only question, then, is whether the evidence that Miller was a target of the police investigation, was threatened with prosecution, but was in fact never charged, would have been material under the test set out in *United States v. Agurs, i. e.,* whether it creates a reasonable doubt that did not otherwise exist.[21] I conclude that the answer to that question must be in the affirmative.

Given the fact that Miller was the State's only "clean" witness, and that the prosecutor emphasized this fact in his argument, it would necessarily have had a definite impact on the jury had the defense been able to show not only that Miller had been a co-conspirator with John Bishop and Vernale in the stolen-goods ring, but that the State Police had been aware of this fact and for some unexplained reason had chosen not to press charges against him. It does not require an unusually agile imagination to tie Miller's testimony to his personal freedom. The suppressed evidence does, therefore, in my estimation, give rise to a reasonable doubt as to the petitioner's guilt, and in light of this fact I conclude that he was deprived of due process when the prosecution chose to suppress it.[22]

## IV. *The* Namet *Claim*

■ One additional claim raised by the petitioner merits discussion. Petitioner charges that the State violated his rights under the sixth and fourteenth amendments when it called Charles Vernale, the

alleged central figure in the stolen-goods ring, to testify despite knowledge that Vernale would claim his rights under the fifth amendment, and then, in its closing argument, invited the jury to draw an inference from Vernale's refusal to testify.

At the trial, when the State announced its intention to call Vernale, petitioner's counsel informed the court that Vernale was then facing charges arising from the same transaction, that his court-appointed attorney was present in court, and that he believed that Vernale would refuse to testify, with the likelihood that the jury might draw adverse inferences against the defendant. The prosecutor represented that he had no knowledge of Vernale's intention to refuse to testify. He furthermore objected to the defense's suggestion of a preliminary *voir dire,* out of the presence of the jury.[23]

The trial court overruled the defense objection and allowed the State to call Vernale. After several preliminary questions, in answer to which Vernale stated that he and the defendant were friends, the following occurred:

"Q. And tell the ladies and gentlemen of the jury something about your friendship. What did it involve or entail, for example?

"A. I would like to take the Fifth Amendment on that for the simple reason I don't want to incriminate myself in any way. This is not my trial.

"Q. All right. Were you ever an informant for Mr. Moynahan?

"A. Never. I was never an informer.

"Q. "Did you ever give him any information of any kind concerning criminal activities?

21. Prior to the decision in *Agurs,* the rule in the Second Circuit was that the standard of materiality varied with the prosecutor's culpability. *See, e. g., United States v. Morell,* 524 F.2d 550 (2d Cir. 1975); *United States v. Seijo,* 514 F.2d 1357 (2d Cir. 1975). This rule was rejected in *Agurs,* however, in favor of a standard which varies according to the specificity of the request for disclosure.

22. The petitioner argues that the State also suppressed exculpatory impeachment evidence

concerning John Bishop, the admitted thief. A review of the evidence leads to the conclusion that although some evidence was suppressed which should have been released, no item or combination thereof was such that it could be considered material under the *Agurs* standard.

23. In light of his knowledge of Vernale's pending criminal charges, and his objection to the *voir dire,* the prosecutor's representation is open to question.

"A. I take the Fifth Amendment on that. I don't want to incriminate myself in any way, also.

"Q. Did you ever make a gift of a television set, a color television set, to Mr. Moynahan?

"A. I take the Fifth Amendment on that. I don't want to incriminate myself."

Tr. 21–22, Exhibit 3 to Defendant's Return.

The State asked no further questions of Vernale. On cross-examination, Vernale was willing to testify on some subjects but stated his intention to invoke the fifth amendment concerning the events which underlay the charges against Mr. Moynahan. Vernale's refusal to testify was the subject of a comment by the prosecutor in his rebuttal argument,[24] as well as an instruction by the trial judge.[25]

The question for this court is whether these occurrences combined to deprive Mr. Moynahan of his right to a fair trial, or to his right to confront a key witness against him.

At the outset, it must be noted that the practice of allowing a witness, especially one involved in the same crime, to testify with knowledge that he or she will invoke the fifth amendment has been almost universally criticized.[26] This is because of the recognition that, even despite a curative instruction, the jury will probably not be able to resist drawing an unfavorable inference from the simple invocation of the privilege.[27] It does not, however, follow that every transgression of the desired rule warrants reversal, or as in this case, the issuance of a writ of habeas corpus.

The central case in this area is, of course, *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), whose principle was raised to constitutional level and made applicable to state proceedings in *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). Under the rule set out in those cases, the practice of compelling a witness to invoke his fifth amendment privilege can require reversal in two circumstances: (1) when it amounts to pros-

---

**24.** In response to the defense's attacks on the credibility of its witnesses, the prosecution admitted that neither John Bishop nor Vernale were reputable. In his reference to Vernale however, the prosecutor emphasized his refusal to testify:

"And Charlie Vernale, who was asked, 'Did you give the defendant, Paul Moynahan, a color television set? Did you deliver it to him?' And he took the Fifth Amendment. He is not a very great guy."

Tr. 1969, Exhibit 10 to Defendant's Return.

**25.** Curiously, the judge repeated the offending questions in the curative instruction. He then charged however:

"Under our Constitution Mr. Charles Vernale had the right to refuse to answer those questions on the ground of self-incrimination. [C]onsequently, you are now instructed that no inferences should be drawn by you as to what the answers might have been. And, of course, you are not to draw any adverse inferences against Mr. Paul Moynahan by reason of the fact that Charles Vernale refused to answer the questions on Constitutional grounds or, for that matter, on any other grounds."

Tr. 1993, Exhibit 8 to Defendant's Return.

**26.** In its review of the trial, the Connecticut Supreme Court offered the justification that the prosecutor had to at least call the witness and have him invoke his privilege on the record in order to avoid the so-called "missing witness" charge to the effect that the jury may draw an unfavorable inference from the failure of a party to produce a witness whom it should naturally call and whom it had the power to produce. *Queen v. Gagliola*, 162 Conn. 164, 168, 292 A.2d 890 (1972); *Secondino v. New Haven Gas Co.*, 147 Conn. 672, 675, 165 A.2d 598 (1960). However, this inference is generally held not to apply to a witness who is privileged. 2 Wigmore, *Evidence* § 286 (3d ed. 1940). *Cf.* Rule 804(a)(1), Fed.R.Evid. *And see Thomas v. Ganezer*, 137 Conn. 415, 422, 78 A.2d 539, 543 (1951), where the court stated:

"Because of her inability, in so far as appeared, to add anything of testimonial value for the consideration of the jury, the defendant was not in that category of witnesses who would naturally have been called to the stand."

Furthermore, as Judge Learned Hand pointed out in *United States v. Maloney*, 262 F.2d 535, 537 (2d Cir. 1959), in these circumstances, the interest of the defendant in avoiding an inference of guilt simply outweighs that of the State in avoiding the inference which arises from not having called a particular witness.

**27.** See the discussion in *In re Fernandez*, 31 Conn.Sup. 53, 59 n.2, 321 A.2d 862 (Sup.Ct. New Haven Co. 1974).

ecutorial misconduct, *i. e.*, when a prosecutor knowingly attempts to influence the jury through the impermissible inference, and thus deprives the defendant of his right to due process; or (2) when it allows the prosecution to add critical weight to its case by eliciting evidence of inferences in a manner which does not allow the defendant to subject the witness to cross-examination, and thus deprives him of his right to confrontation guaranteed by the sixth amendment.[28]

Unfortunately, this rule has not proved easy to apply. Because it requires a subjective weighing of the evidence submitted by the prosecution, the prosecutor's intentions, and the likely overall effect on the jury; it is not unusual that the decided cases offer no clear guideline, and in some cases appear to come to different conclusions on nearly identical facts.[29]

Among the factors which courts take into account appear to be: the prosecutor's intent in calling the witness, the number of questions which he asks, the importance of the questions to his case, whether there is a reference to the testimony in the closing argument, and whether or not the judge gives a curative instruction.[30]

The present case appears to be the classic borderline case. The question of the prose-

cutor's intent is not clear. While I find that he had at least constructive knowledge of Vernale's intention to refuse to testify, there is no evidence of flagrant behavior on his part. While there were only three questions involved, one of them, the last one asked, was critical, and it was repeated in the prosecutor's rebuttal and in the trial judge's instructions.

The question of the critical weight of the inference and its impact on the jury is similarly unclear. This is probably the central factor, and at least one court has reversed a conviction on similar facts.[31] The State argues, however, that the inference was not critical in this case, because the testimony of John Bishop was corroborated by that of Miller. While that is no doubt true, it is also, however, the result of the two constitutional errors which I have already discussed. Had the defense been able to thoroughly cross-examine Miller, and had it had the advantage of full disclosure by the prosecutor, it would have been unlikely that Miller could have added measurably to the overall credibility of the State's case.

The prosecutor's reference in his rebuttal argument, which was clearly improper, was not especially flagrant. While he did repeat the testimony, he was content to leave it at that, and did not go the extra step of actually arguing the inference to the jury.

---

**28.** Made applicable to the states in *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

**29.** *Compare Cain v. Cupp*, 442 F.2d 356, 358 (9th Cir. 1971), which stated:
"Although calling the witness may not in itself be sufficient to justify habeas corpus relief, when coupled with the prosecutor's closing argument, it will justify such relief." *with Cota v. Eyman*, 453 F.2d 691 (9th Cir. 1971), *cert. denied*, 406 U.S. 949, 92 S.Ct. 2054, 32 L.Ed.2d 338 (1972), decided only eight months later, which on nearly identical facts denied relief and distinguished *Cain* on the length of the reference in the prosecutor's closing argument.

**30.** The Court of Appeals for the Eighth Circuit has held that once error is committed, it cannot be cured by an instruction. *United States v. King*, 461 F.2d 53 (8th Cir. 1972). The position of the Second Circuit is not clear. While Judge Learned Hand stated that a curative instruction could be an extenuating circumstance, *United*

*States v. Maloney*, 262 F.2d 535, 538 (2d Cir. 1959), he felt bound by a line of cases whose reasoning was later rejected in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In this case, however, I do consider the curative instruction, following *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). *And see United States v. Burket*, 480 F.2d 568 (2d Cir. 1973).

**31.** In *United States v. Maloney, supra*, the court placed great emphasis on the quality of the other evidence before the jury. It noted:
"The jury was unlikely to accept Parker's testimony unless it was corroborated. He had been an accomplice and hoped for lenity by inculpating his associates. Moreover, his own criminal record was extremely bad." 262 F.2d at 536.
This statement applies as well to the testimony of the admitted thief in this case, John Bishop.

Finally there is the judge's curative instruction, which although intended to preclude the jury from drawing the improper inferences, actually compounded the error by refreshing the jury's memory of the critical nature of the question asked.

Fortunately, it is not necessary for me to decide whether, had this been the sole constitutional attack on the conviction, it would have merited relief in the nature of habeas corpus. It is enough to say that it was improper on the part of the prosecutor to ask the questions in the face of his knowledge of Vernale's intention, and to comment on Vernale's refusal to testify in his closing argument. This behavior significantly added to the unfairness of a proceeding which I have already found failed to meet constitutional requirements in two other respects.

### V. *The Remaining Claims*

In addition to the four claims which I have outlined, the petitioner raises five additional challenges which I find do not merit extended discussion.

■■■ The petitioner objects that a State Police officer was allowed to testify to his recollection of an interview with the defendant, despite the fact that the State could have introduced a verbatim transcript of the interview. Even if the petitioner were correct in his claim that this was a violation of the "best evidence" rule, and under the prevailing interpretation he is not,[32] this claim raises at best an evidentiary issue, and is therefore not properly cognizable in habeas corpus. *Grimes v. Wainwright*, 346 F.Supp. 713 (N.D.Fla.1972).

■■■ The objection to that part of the judge's charge which cautioned the jury to weigh the petitioner's interest in the outcome of the trial when weighing his credibility is without merit. *United States v. Mahler*, 363 F.2d 673, 678 (2d Cir. 1966).

■■■ The petitioner's challenge to Connecticut's one-man grand jury procedure[33] is likewise without merit. The constitutionality of that system has been upheld on prior occasions by this court.[34] Insofar as the petitioner claims that he should have been given the warnings prescribed in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prior to his appearance before the grand jury, his claim is precluded by *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976). Also without merit is petitioner's claim that he was denied due process because in Connecticut the State's Attorneys, or prosecutors, are appointed by the courts before whom they practice.[35] Cf. *United States v. Richmond*, 277 F.2d 702, 703 (2d Cir. 1960); *United States v. Solomon*, 216 F.Supp. 835, 838–43 (S.D.N.Y. 1963).

Finally, the petitioner's last two challenges, that he was denied a fair trial due to pre-trial publicity, and that he was denied due process by the Connecticut Supreme Court because it failed to explicitly rule on each of the points he raised on appeal, are frivolous.

### VI. *Conclusion*

Petitioner has demonstrated that his conviction was accomplished in a proceeding in which he was denied material exculpatory evidence by the prosecution, and was effectively denied the right to cross-examine two of the three affirmative witnesses against him. In light of these errors of constitutional magnitude, his conviction cannot be allowed to stand. Therefore, unless the State shall elect to retry the petitioner within sixty days of the entry of judgment in this action, a writ of habeas corpus shall

---

32. *See, e. g., People v. Swayze*, 220 Cal.App.2d 476, 34 Cal.Rptr. 5 (1963); McCormick, *Evidence* § 232 at 562–63 & n.26 (2d ed. 1972).

33. Conn.Gen.Stat.Ann. § 54–47 (1976 Supp.).

34. *Puglia v. Cotter*, 333 F.Supp. 940 (D.Conn.), *aff'd mem.*, 450 F.2d 1362 (2d Cir. 1971), *cert.*

denied, 405 U.S. 1073, 92 S.Ct. 1492, 31 L.Ed.2d 806 (1972); *Salvaggio v. Cotter*, 324 F.Supp. 681 (D.Conn.), *aff'd mem.*, 447 F.2d 1406 (2d Cir. 1971).

35. Conn.Gen.Stat.Ann. § 51–278 (1976 Supp.).

enter, and he shall be released from custody.

SO ORDERED.