Ex parte IRVINE.

Ex parte WAGNER.

(Circuit Court, S. D. Ohio, W. D. April 7, 1896.)

1. JURISDICTION IN HABEAS CORPUS PROCEEDINGS — WITNESS COMMITTED FOR CONTEMPT.

Upon a writ of habeas corpus to procure the release of a person who has been committed for contempt in refusing to answer questions propounded

to him in a criminal case, on the ground that his answers would tend to criminate himself, the court may consider the testimony and the facts upon which the committing court based its action against the witness. Counselman v. Hitchcock, 12 Sup. Ct. 195, 142 U. S. 547, and Ex parte Fisk, 5 Sup. Ct. 724, 113 U. S. 713, followed.

2. CONSTITUTIONAL LAW — EXAMINATION OF WITNESSES — INCRIMINATING TESTIMONY.

A witness cannot avoid answering any question by the mere statement that the answer would tend to incriminate him, without regard to whether the statement is reasonable or not. On the contrary, it is for the judge before whom the question arises to decide whether an answer thereto may reasonably have a tendency to criminate the witness, or to furnish proof of an element or link in the chain of evidence necessary to convict him of a crime.

3. SAME—PROTECTION OF WITNESS.

The provision in Rev. St. § 860, forbidding the use of admissions of witnesses against them in criminal prosecutions in the federal courts, does not neutralize or modify the right of protection secured to the witness by the fifth amendment to the constitution. Counselman v. Hitchcock, 12 Sup. Ct. 195, 142 U. S. 547, followed.

4. SAME—EQUITABLE RIGHT TO PARDON.

The equitable right of an accomplice, who is called upon by the government to give testimony against those with whom he was engaged in violating the law, to an executive pardon, if he fully and fairly states the truth, does not do away with his constitutional privilege of refusing to give evidence against himself.

5. SAME.

Where, from the evidence and the nature of the question, the court can definitely determine that the question, if answered in a particular way, will form a link in the chain of evidence to establish the commission of a crime by the witness, the court cannot inquire whether the witness claimed his privilege in good faith or otherwise. It is only where the criminating effect of the question is doubtful that the witness' motive may be considered, for in such case his bad faith would tend to show that his answer would not subject him to any danger.

These are petitions for habeas corpus.

The petitioners, R. W. Irvine and J. C. Wagner, were committed to the county jail of Warren county by order of the circuit court of the United States for the Southern district of Ohio, Western division, for contempt in refusing to answer certain questions propounded to them when called and sworn as witnesses for the United States in the trial of an indictment against 12 defendants for conspiracy to commit an offense against the United States. The offense which the defendants were charged with conspiring to commit against the United States was a violation of the act of March 2, 1895, for the suppression of lottery traffic through interstate commerce. The first section of the act provides that any person who shall cause to be carried from one state to another in the United States any papers, certificates, or instruments purporting to be or represent a ticket, chance, share, or interest in or dependent upon the event of a lottery, offering prizes upon lot or chance, shall be punishable, for the first offense, by imprisonment for not more than two years, or by a fine of not more than $1,000, or both, and for the second and after offenses by such imprisonment only. The indictment is against Albert L. France, Benjamin Hollen, George Williams, Nat Hyams, George Bickle, and seven others, charging them with conspiracy to commit the offense against the United States of causing to be carried from Covington, Ky., to Cincinnati, Ohio, papers, certificates, and instruments purporting to be or to represent, as defendants well knew, chances, shares, and interests in prizes which, by lot or chance, might be awarded to persons to the grand jury unknown in the drawings of the so-called "Kentucky Lottery" and the so-called "Henry Lottery," enterprises offering prizes dependent upon lot or chance, and commonly known as "policy," and further charging that, in pursuance of said conspiracy,

France and Hollen, of the defendants, did on October 4, 1895, cause certain described certificates of the character above mentioned to be carried from Covington, Ky., to Cincinnati, Ohio. The first witness for the government was E. D. Seeley, who testified that George Williams conducted a policy or lottery shop, in which he received money and bets, at the corner of John and Third streets in Cincinnati, Ohio; that George Bickle did the same thing at the corner of Fourteenth or Fifteenth streets and Central avenue in the same city; that Benjamin Hollen worked in the office in Kentucky where the bets and money were received, and acted as cashier for the lottery company; that there were carriers who carried the bets and money from Cincinnati to the place where Hollen was in Covington, and who brought back from there the certificates or slips announcing the first 12 numbers drawn in the lottery for that day; that Robert Irvine, one of the petitioners, and that Wagner, the other petitioner, were of those who carried the bets and money from the policy shops in Cincinnati to the office in Covington, and carried back to the policy shops in Cincinnati the slips or certificates showing the numbers drawn and the bets which had won; that these petitioners were carriers in October at the time the offense was charged to have been committed in the indictment; that John Edgar was a runner or carrier engaged in the same business between the head office in Covington and the policy shops in Cincinnati. Other testimony corroborative of this was introduced, and then Robert Irvine was called to the stand. The report of the part of his examination which shows the questions put him, his refusals to answer, and the action of the court is as follows:

"By Mr. Cleveland, United States Attorney: Q. Mr. Irvine, I will ask you if, during that same period [from March 2, 1895, to October 4, 1895], Benjamin Hollen was not engaged in and connected with the H. and K. lotteries or policies. (Objected to by counsel for defendants. Objection overruled. Exception reserved.) A. Well, I will have to decline to answer that question, on the ground that it might tend to incriminate me. The Court: I will not recognize that, as by answering that question you could not possibly criminate yourself. (The court here explains to the witness the law upon the subject.) A. Well, I still decline to answer. The Court: Then I will commit you to the Warren county jail, at Lebanon, Ohio, for the term of 30 days, your commitment to take place at the close of this examination. Mr. Cleveland: Q. I will ask you, Mr. Irvine, if George Williams was not, prior to October, 1895, and during that year, a policy writer, in Cincinnati, for the H. and K., or the Henry and Kentucky, lotteries or policies, located at Third and John streets, this city. A. I decline to answer that. The Court: That comes under the same rule, Mr. Irvine, and there is no reason why you should not answer it. Do you still decline? A. Yes, sir; I will have to, on the ground that it might tend to incriminate me. The Court: I have just told you that it cannot possibly do so. A. Well, I will have to decline to answer it. The Court: Then I will impose another 30 days' imprisonment in the Warren county jail, this sentence to commence upon the expiration of the preceding one. Mr. Cleveland: Q. I will ask you, Mr. Irvine, if Nat Hyams was, last year, prior to October, and during the year 1895, engaged as a policy writer for the H. and K. lotteries or policies, or the Henry and Kentucky policies, at a place on George street, between Plum and Central avenue, in this city. A. I will have to decline to answer that question, on the ground that it might incriminate me. The Court: Mr. Irvine, that comes under the same rule. You are bound to answer that question. Do you still decline? A. Yes, sir. The Court: Well, then, there will be a third sentence imposed upon you of 60 days in the Warren county jail, at Lebanon, Ohio, to begin at the expiration of the last two sentences. Mr. Cleveland: Well, how about George Bickle, during the same period? Was he a policy writer for the H. and K., or Henry and Kentucky, lotteries or policies? Or I will ask you the question definitely. Will you state whether or not George Bickle, prior to October 4th of last year, and during 1895, was or was not a policy writer for the H. and K. lotteries or policies, located at the end of Wade street and Central avenue, in Cincinnati? A. I will have to decline to answer that question. Q. Upon what ground do you decline to answer? A. Upon the same ground, that it might tend to incriminate me. The Court: Well, I will sentence you to 90 days in

the Warren county jail, the sentence to begin at the expiration of the preceding sentence. Mr. Cleveland: Q. Do you know what John Edgar's duties were as a clerk,—what kind of duties he performed? A. Yes, sir. Q. What were they? A. Well, I decline to answer that question, on the ground that it might tend to incriminate me. The Court: I will give you another sentence of 60 days in the Warren county jail, this sentence to begin upon the expiration of the preceding one. Mr. Cleveland: Q. I will ask you to state, Mr. Irvine, if John Edgar was not a 'runner' for the H. and K. lotteries or policies, between Covington, Ky., and Cincinnati, Ohio, or a 'carrier,' prior to October 4th of last year, and during 1895. A. I decline to answer that question, on the same ground. The Court: Well, I will then impose another sentence upon you of 60 days in the Warren county jail, to begin at the expiration of the preceding one. Mr. Cleveland: Q. What were the duties of J. C. Wagner, as clerk, so far as you know, if you know? A. I decline to answer that question. Q. Upon what ground? A. Upon the ground that it might tend to incriminate me. The Court: Now, Mr. Irvine, I will state this matter again to you. (Does so at length.) Do you still decline to answer that question? A. Well, I will state that I do know what his duties were. Q. What were they? A. That I will decline to answer. The Court: Then I will sentence you to another 60 days in the Warren county jail, to begin upon the expiration of the former sentence. Mr. Cleveland: Q. Mr. Irvine, I will ask you if John Edgar is not a carrier or 'runner' for the H. and K. lotteries or policies, for the Middle division of this city,—if he was not, on October 4th of last year, and prior thereto, in 1895. A. Well, I will have to decline to answer that question, on the ground that it might tend to incriminate me. Q. I will ask you to state if J. C. Wagner was not a carrier or 'runner' for the Eastern division of Cincinnati, for the H. and K. lotteries or policies, during last year, prior to October 4th, and during 1895. A. Well, I will have to decline to answer that, on the same ground, that it might tend to incriminate me. The Court: I think the witness is bound to answer both of those questions. Do you still decline? A. Yes, sir: I must decline to answer, on the ground that it might tend to incriminate me. The Court: Then I will sentence you a further 60 days in the Warren county jail, to take effect upon the expiration of the former sentence. (Witness remanded to the custody of the United States marshal.)"

The questions put to Wagner, his refusal to answer, and the action of the court are shown by the following:

"Mr. Cleveland: Q. Mr. Wagner, do you know Benjamin Hollen? A. Yes, sir. Q. What was his business in October of last year, up to October 4, 1895, and during that year? A. I decline to answer that question, on the ground that it might incriminate me. The Court: No, you will have to answer that question. That is not privileged. Mr. Cleveland: Q. Do you still decline to answer that question? A. I will have to answer, one way or the other? The Court: Yes. A. Well, I decline to answer it, on the ground that it may tend to incriminate myself. The Court: I will sentence you to the Warren county jail for 30 days."

Commitments were duly issued, and the form of all may be seen from the following copy of one:

"United States District Court, Southern District of Ohio, Western Division. "United States vs. Albert L. France et al.

"On this day came Robert W. Irvine, and, having been duly sworn as a witness on behalf of the government, proceeds to give his testimony. In the course of his examination the following question was put to him: 'I will ask you if, during the same period of 1895, Benjamin E. Hollen was not engaged in and connected with the Henry and Kentucky lotteries.' To which the witness answered: 'Well, I will have to decline to answer that, on the ground that it might criminate me.' The judge thereupon explained to the witness that upon no reasonable or probable construction of any act of the United States or of the state of Kentucky could the answer to the question tend to criminate the witness, and, having made such explanation, inquired if he still persisted in his refusal to answer, or whether he was willing to answer, to which the witness answered, 'I still decline to answer it.' The court thereupon held that the witness was guilty of contempt of court in refusing to

answer said question. Wherefore it is the sentence of the court, for said contempt, that the said witness be imprisoned in the Warren county jail, at Lebanon, for the term of thirty days, and the court directs that an order of committment issue accordingly."

The return of the sheriff and jailer of Warren county jail sets forth the commitments upon which he holds the prisoners.

The government, for the purpose of showing that the privilege of the witness Irvine had not been pleaded in good faith by him, introduced the following part of his examination:

"Mr. Cleveland: Q. Mr. Irvine, who told you to refuse to answer these questions, on the ground that it would incriminate you? A. Well, I went to see Mr. Goldsmith, to know what my rights as a witness were, and— Q. I will ask you if Mr. Goldsmith did not send for you to come to him. A. I don't know who sent for me. Q. Were you not sent there to his office? (Objection interposed by counsel for defendants.) Q. I will ask you to answer the question. Mr. Irvine, if you were not sent to Mr. Goldsmith. A. Well, I— My recollection is— I was— I met one of the counsel on the street, and they told me that he would like to see me at Mr. Goldsmith's office. Q. Who was that one that you met? A. If I am not mistaken it was Mr. Cogan. Q. And that is the reason that you went there to Mr. Goldsmith's office? A. Yes, sir. Q. You knew that Mr. Cogan and Mr. Goldsmith represented the defendants, didn't you? A. Yes, sir. Q. And that is the first you heard of taking the stand and refusing to answer questions, on the ground that you would be incriminating yourself, was it not? A. I wanted to find out what my rights as a witness were, because, before the grand jury, I asked you if I must answer certain questions, and you said that I must,—that you would not have asked them if they were not to be answered. Q. Did you claim any privilege before the grand jury? A. I did not claim or ask any privilege. I asked you if I must answer those questions, and you said that I must."

Miller Outcalt and W. W. Granger, for petitioner.
Harlan Cleveland, for the United States.

TAFT, Circuit Judge (after stating the facts). The validity of the commitments here under examination depends upon the power of the court which made them. The general power of the court to compel, by its process of contempt, witnesses to appear, to be sworn, and to testify in causes pending before it, is clear. The power has, however, a limitation imposed by the fifth amendment to the constitution, which provides "that no person shall be compelled in any criminal case to be a witness against himself." The supreme court of the United States, in Counselman v. Hitchcock, 142 U. S. 547, 12 Sup. Ct. 195, declared the object of this amendment to be to insure that a person shall not be compelled, when acting as a witness in any investigation, to give testimony which may tend to show that he himself has committed a crime. In that case it was contended for the government that section 860 of the Revised Statutes, which provided that no evidence given by the witness should be in any manner used against him in any court of the United States in any criminal proceeding, furnished such a protection to the witness that the court might compel him to answer questions which, on their face, would have a tendency to criminate him. But the court held that it was a reasonable construction of the constitutional provision that the witness should be protected from being compelled to disclose the circumstances of his offense, or the source from which or the means by which evidence of its commission and of his connection with it might be obtained and made effectual for his conviction,

without using his answers as direct admissions against him; that no statute which left the party or witness subject to prosecution if he answered the criminating question put to him could have the effect of supplanting the privilege conferred by the constitution; and that, in view of the constitutional provision, before the statute could be used for the purpose sought, it must afford absolute immunity against future prosecution for the offense to which the question related.

The first question for consideration in this hearing is how far this court may look beyond the commitment and its recitals into the evidence and circumstances upon which the committing court acted. It is and must be conceded that the court had full jurisdiction to try the indictment, to issue the subpœna which brought the witness to the stand, and to direct him to be sworn. It had jurisdiction over the defendants and over the cause. But the act of the court here complained of, while in the course of the trial of the indictment and of the defendants, concerned one who was not a party to the proceeding; and the jurisdiction of the court with reference to the witness is distinct from, though it grows out of, the jurisdiction to try the indictment. It is possible that the witness, by a direct proceeding in error as from a criminal case, might have the validity of his sentence inquired into by an appellate court. Whether this be true or not, it is unnecessary to decide. It is clear that the decisions of the supreme court require this court to hold that, upon such a question as this, the testimony and facts upon which the court acted in committing the witness may and must be considered by the court before which the validity of the commitment is to be tested in a collateral way upon habeas corpus. In the Counselman Case, the whole proceeding, together with all the evidence given by the witness and the action of the court, was examined on habeas corpus. In the case of Ex parte Fisk, 113 U. S. 713, 5 Sup. Ct. 724, the question was on habeas corpus to determine the validity of the commitment for contempt of a party defendant to an action removed to the federal court from the state court in New York, for his refusal to answer a question put to him in a proceeding authorized by a statute of the state for the examination of defendants before a master prior to the trial. In that case the court held that the statutory procedure was not applicable to the federal court, and therefore that the court was without power to compel a witness to answer in such proceeding, and that the commitment was void. In that case the entire proceeding before the circuit court was considered by the supreme court. The question whether the statute applied to the examination of witnesses in a federal court was a mere matter of procedure, which, with reference to the cause under consideration by the court, could not affect its jurisdiction. It had the power to decide whether that procedure should be followed in the cause, and a judgment rendered by it in the cause would not have been void, even though reached by evidence obtained in accordance with the state statute; but when the statute was used as the basis for a commitment for contempt by a witness who declined to answer, its application to the federal practice did affect the power and jurisdiction of the court to commit the

witness whose testimony was invoked under it. In the light of the Counselman Case and the case of Ex parte Fisk, the duty of this court to examine into and consider the facts upon which the trial court acted in committing the petitioners cannot be doubted. If the petitioners, in their refusal to answer the questions, were within the protection of the fifth amendment to the constitution, the power of the court to commit them for their refusal was exceeded, and the invalidity of the commitment may be declared in this collateral inquiry.

The second question is whether the statement of the witness that his answer to the question would criminate him was conclusive, so that the court could not compel an answer thereto. The great weight of authority, as well as a due regard for the right of the community to have the wheels of justice unclogged, as far as may be consistent with the liberty of the individual, leads us to reject the doctrine that a witness may avoid answering any question by the mere statement that the answer would criminate him, however unreasonable such statement may be. The true rule is that it is for the judge before whom the question arises to decide whether an answer to the question put may reasonably have a tendency to criminate the witness, or to furnish proof of a link in the chain of evidence necessary to convict him of a crime. It is impossible to conceive of a question which might not elicit a fact useful as a link in proving some supposable crime against a witness. The mere statement of his name or of his place of residence might identify him as a felon, but it is not enough that the answer to the question may furnish evidence out of the witness' mouth of a fact which, upon some imaginary hypothesis, would be the one link wanting in the chain of proof against him of a crime. It must appear to the court, from the character of the question, and the other facts adduced in the case, that there is some tangible and substantial probability that the answer of the witness may help to convict him of a crime. Mr. Wharton, in his work on Criminal Evidence (section 466), says:

"We have several rulings to the effect that a witness cannot be compelled to give a link to a chain of evidence by which his conviction of a criminal offense can be furthered. This proposition, however, cannot be maintained to its full extent, since there is no answer which a witness could give which might not become part of a supposable concatenation of incidents from which criminality of some kind might be inferred. To protect the witness from answering, it must appear, from the nature of the evidence which the witness is called to give, that there is reasonable ground to apprehend that, should he answer, he would be exposed to a criminal prosecution. The witness, as will presently be seen. is not exclusive judge as to whether he is entitled on this ground to refuse to answer. The question is for the discretion of the judge, and, in exercising this discretion, he must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence. But, in any view, the danger to be apprehended must be real, with reference to the probable operation of law in the ordinary course of things, and not merely speculative, having reference to some remote and unlikely contingency."

In section 469 of the same work it is stated that the witness is not the sole judge of his liability. The liability must appear reasonable to the court, or the witness will be compelled to answer. Nu-

merous cases are cited in the notes in support of the proposition as stated in the text.

Chief Justice Marshall, in the trial of Aaron Burr (Fed. Cas. No. 14,692e), was confronted with the question, and elucidated it in a way characteristic of that great jurist. After stating that the proposition, contended for on the part of the witness, that he was to be the sole judge of the effect of his answer, was too broad, while that on the other side, that a witness can never refuse unless the answer will per se convict him of a crime, was too narrow, and that he is not compellable to disclose a single link in the chain of proof against him, he added:

"When two principles come in conflict with each other, the court must give them both a reasonable construction, so as to preserve them both to a reasonable extent. The principle which entitles the United States to the testimony of every citizen, and the principle by which every witness is privileged not to accuse himself, can neither of them be entirely disregarded. They are believed both to be preserved to a reasonable extent, and according to the true intention of the rule and of the exception to that rule, by observing that course which, it is conceived, courts have generally observed. It is this: When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness. If this be decided in the negative, then he may answer it, without violating the privilege which is secured to him by law. If a direct answer to it may criminate himself, then he must be the sole judge what his answer would be. The court cannot participate with him in this judgment, because they cannot decide on the effect of his answer without knowing what it would be; and a disclosure of that fact to the judges would strip him of the privilege which the law allows, and which he claims. * * * The counsel for the United States have also laid down this rule according to their understanding of it, but they appear to the court to have made it as much too narrow as the counsel for the witness have made it too broad. According to their statement, a witness can never refuse to answer any question unless that answer, unconnected with other testimony, would be sufficient to convict him of a crime. This would be rendering the rule almost perfectly worthless. Many links frequently compose that chain of testimony which is necessary to convict any individual of a crime. It appears to the court to be the true sense of the rule that no witness is compellable to furnish any one of them against himself. It is certainly not only a possible, but a probable, case that a witness, by disclosing a single fact, may complete the testimony against himself, and to every effectual purpose accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact, of itself, might be unavailing, but all other facts without it would be insufficient. While that remains concealed within his own bosom, he is safe; but, draw it from thence, and he is exposed to a prosecution. The rule which declares that no man is compellable to accuse himself would most obviously be infringed by compelling a witness to disclose a fact of this description. What testimony may be possessed or is attainable against any individual the court can never know. It would seem, then, that the court ought never to compel a witness to give an answer which discloses a fact that would form a necessary and essential part of a crime which is punishable by the law."

### The chief justice summed up the rule as follows:

"The gentlemen of the bar will understand the rule laid down by the court to be this: It is the province of the court to judge whether any direct answer to the question which may be proposed will furnish evidence against the witness. If such answer may disclose a fact which forms a necessary and essential link in the chain of testimony which would be sufficient to convict him of any crime, he is not bound to answer it, so as to furnish matter for that conviction. In such a case, the witness must himself judge what his an-

swer will be, and if he say, on oath, that he cannot answer without accusing himself, he cannot be compelled to answer."

In Ex parte Reynolds, 20 Ch. Div. 294, the court of appeal followed and approved the decision of the queen's bench in the case of Reg. v. Boyes, 1 Best & S. 329, and from these two cases it may be said that the settled law of England is that, "to entitle a party called as a witness to the privilege of silence, the court must see, from the circumstances of the case and the nature of the evidence which the witness is called to give, that there is reasonable ground to apprehend danger to the witness from his being compelled to answer," but that, "if the fact of the witness being in danger be once made to appear, great latitude should be allowed to him in judging for himself of the effect of any particular question, there being no doubt  *   *   *  that a question which might appear at first sight a very innocent one might, by affording a link in a chain of evidence, become the means of bringing home an offense to the party answering." See, also, People v. Mather, 4 Wend. 229, and cases cited in Whart. Cr. Ev. § 469, note 1.

We come, lastly, to the question whether there was reasonable ground for the court to infer that the answers to the questions put to the petitioners might furnish a link in the evidence which would subject them to prosecution and punishment for a crime. It will not be denied that one who carries lottery tickets or certificates or policy slips from one state into another, knowing them to be such, aids and abets the person who causes or hires him to do this in violating the statute of the United States above quoted, and thus may be found guilty of conspiring with his principal to violate it. It had appeared in evidence, before the petitioners were put upon the stand, that each of them carried packages and money from the office of Hollen in Covington to the offices of Williams, of Hyams, and of Bickle, in Cincinnati, and that Edgar was a man engaged in the same business at the same time, carrying packages of the same character between Covington and Cincinnati. It was suggested at the argument that an affirmative answer by the petitioners when upon the stand to the questions which they declined to answer would tend to show knowledge on their part of the character and use of the matter which they were carrying. Certainly such answers would have the effect to show that the witnesses, when upon the stand, had knowledge that the papers which they had carried prior to October, 1895, between lottery and policy offices had relation to that business; but it may be doubted whether an answer as to their present knowledge would have any tendency to show that they knew the character of the business prior to October, 1895, when they were engaged in maintaining communication between the offices. In the opinion of Chief Justice Marshall on the trial of Aaron Burr (Fed. Cas. No. 14,692e), in the case of the witness Willie, it appeared that Willie was the private secretary of Burr. He was called upon to give evidence concerning a cipher letter which Burr had written, and to state the meaning of its contents. He pleaded his privilege. The chief justice made this ruling:

"To know and conceal the treason of another is misprision of treason, and is punishable by law. No witness, therefore, is compellable by law to disclose a fact which would form a necessary and essential part of this crime. If the letter in question contain evidence of treason, which is a fact not dependent on the testimony of the witness before the court, and therefore may be proved without the aid of his testimony, and if the witness were acquainted with that treason when the letter was written, he may probably be guilty of misprision of treason, and therefore the court ought not to compel him to answer any question the answer to which might disclose his former knowledge of the contents of that letter. * * * But on hearing the question more particularly and precisely stated, and finding that it refers only to the present knowledge of the cipher, it appears to the court that the question may be answered without implicating the witness, because his present knowledge would not, it is believed, in a criminal prosecution, justify the inference that his knowledge was acquired previous to this trial, or afford the means of proving that fact."

It seems to us that the distinction here taken by the chief justice applies in the case at bar. It is true that the question called for the personal knowledge of the witness, and he might have acquired this personal knowledge at the time the business was being carried on, prior to October, 1895; but he might also have acquired it, by statements of the men themselves, or by some means, subsequent to the time when he carried the packages. He might have acquired the knowledge, and then given up the carrying because of the knowledge so acquired. We do not think that the statement of the witnesses upon the stand could be introduced against them, statutory inhibitions aside, as relevant evidence to show knowledge on their part of the business of Williams and the others prior to October, 1895, when they are shown to have been engaged in carrying the packages.

But there is a view of the evidential effect of possible answers to these questions which makes it necessary for us to hold that they might be criminating, and which therefore entitled the witness to decline to answer them. The admissions of the witnesses as to what the business was of Hollen, Williams, and the other men engaged in promoting the playing of policy prior to October, 1895, would be relevant evidence against them to establish the fact that Williams, Hollen, and the others were engaged in the policy business prior to October, 1895. This fact would be a material link in the chain of evidence to establish the guilt of the witnesses on a charge of conspiracy to cause to be carried across the state line the policy matter declared by the statute to be contraband. The fact of the visits by the witnesses between Hollen's place in Covington and the places of Williams and the others in Cincinnati had been brought out in the previous testimony, and it would seem to be a circumstance of the greatest evidential importance, in proving the complicity of the witnesses in violations of the interstate commerce regulation under discussion, to show that the places between which they were constantly carrying matter were places where matter of the forbidden character would be needed and used.

But it may be suggested that section 860 of the Revised Statutes would forbid the use of such admissions against the witnesses in any criminal prosecution in the federal courts. This is true, but it was distinctly held in the case of Counselman v. Hitchcock, 142

U. S. 547, 12 Sup. Ct. 195, that this section had no effect to neu-
tralize or modify the protection secured to witnesses by the fifth
amendment, because the protection afforded by the section is not
co-extensive with the constitutional provision. The court declared
that:

"No statute which leaves the party or witness subject to prosecution after
he answers the criminating question put to him can have the effect of sup-
planting the privilege conferred by the constitution."

Under this decision section 860 must be left entirely out of con-
sideration in determining whether a witness is entitled to the pro-
tection of the fifth amendment to the constitution.

It is argued for the respondent, represented by the attorneys
for the United States, that the witness is given, by virtue of the
action of the government, entire and absolute immunity from
prosecution for the offense to which the alleged criminating ques-
tion relates, by the long-approved practice of recommending to
the pardon of the executive, accomplices and co-defendants whom
the government calls to establish its case against the principals
and other defendants. The cases of Rex v. Rudd, 1 Cowp. 331,
People v. Whipple, 9 Cow. 707, and Com. v. Knapp, 10 Pick. 492,
are relied upon to show the extent and the binding effect of such
a rule. These cases show that there is an equitable right to a par-
don where an accomplice is called upon by the government to give
testimony against those with whom he was engaged in violating
the law; but we do not find any authority, and none is cited to
us, in which such an equitable right to executive pardon, if the
witness states fully and fairly the truth, has ever been held to do
away with the constitutional privilege not to give evidence against
himself, if he chooses to claim it. See Whisky Cases, 99 U. S.
594. It is a mere equity after all, not dependent upon a positive
statute, and commensurate only with the full and fair revelation
by the witness of the entire truth. If such an equitable exemption
from further prosecution affects the constitutional privilege se-
cured by the fifth amendment, then it is difficult to see why the
same argument might not have been made in the Counselman
Case.

Finally, it is argued by counsel for the respondent that there
was evidence before the trial court to show that the privilege was
pleaded in bad faith, merely to save the defendants, and not to
protect the witnesses from a prosecution of themselves. It is
true that in many of the authorities, particularly the English ones
already referred to, the question of bad faith is regarded as ma-
terial in the matter of determining whether a question will sub-
ject the witness to prosecution. It is to be noted that in the Eng-
lish cases the judges are interpreting and applying a mere rule
of the common law for the protection of witnesses, while we are
enforcing a positive constitutional guaranty. Possibly, therefore,
they may exercise a greater latitude in denying the privilege than
we can. We do not understand any of the American authorities
to go so far as to hold that where, from the evidence and the na-
ture of the question, the court can definitely determine that the

question, if answered in a particular way, will form a link in the chain of evidence to establish the commission of a crime by the witness, the court should inquire into the motive of the witness in pleading his privilege. It is only where the criminating effect of the question is doubtful that the motive of the witness may be considered, for in such a case his bad faith would have a tendency to show that his answer would not subject him to the danger of a criminal prosecution or help to prove him guilty of crime.

On the whole case it is clear that the evidence before the court and the circumstances under which it was sought to elicit the answers from the petitioners as witnesses afforded reasonable ground for concluding that the evidence given by the witnesses might criminate them, and probably establish an offense, and therefore that their plea of the privilege should have been upheld, and that the court had no power to compel answers to the questions put. For these reasons, the prisoners will be discharged.