*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0375p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DANTA DAVIS,

          *Petitioner-Appellant,*

       *v.*

DENNIS STRAUB, Warden,

          *Respondent-Appellee.*

No. 03-2262

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-73319—Gerald E. Rosen, District Judge.

Argued: March 17, 2005

Decided and Filed: September 1, 2005

Before: MERRITT and ROGERS, Circuit Judges; HOOD, Chief District Judge.[*]

---

## COUNSEL

**ARGUED:** John R. Minock, CRAMER, MINOCK & GALLAGHER, Ann Arbor, Michigan, for Appellant. Janet A. Van Cleve, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** John R. Minock, CRAMER, MINOCK & GALLAGHER, Ann Arbor, Michigan, for Appellant. Janet A. Van Cleve, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

      MERRITT, J., delivered the opinion of the court, in which HOOD, D. J., joined. ROGERS, J. (pp. 10-12), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

      MERRITT, Circuit Judge. This case arises from a petition for a writ of habeas corpus by prisoner Danta Davis, who was convicted, along with co-defendant Nathan Bell, for the murders of Sheila Jones and her two young children in 1996. It presents an interesting issue of conflict between a defendant's right to present a defense under the Sixth Amendment and a witness's right to invoke the Self-incrimination Clause. The trial court allowed a crucial defense witness to invoke a blanket assertion of his Fifth Amendment privilege and refuse to answer any questions at all. Both the

---

[*] The Honorable Joseph M. Hood, Chief United States District Judge for the Eastern District of Kentucky, sitting by designation.

Michigan Court of Appeals and the District Court found this approach to be in error but found it to be harmless. The District Court based this determination on the belief that even admitting his presence at the scene of the crime could incriminate the witness. However, this fact had already been clearly established and admitted by the witness in a properly *Mirandized* statement to police. As the Supreme Court has said, "where there can be no further incrimination, there is no basis for the assertion of the privilege." *Mitchell v. United States*, 526 U.S. 314, 326 (1999).

Both petitioner Davis and co-defendant Bell received multiple concurrent life sentences as well as additional sentences for home invasion, mutilation of a body and receiving and concealing stolen property. A magistrate judge recommended that Davis's habeas petition be dismissed; this recommendation was adopted by the District Court. We have granted Certificates of Appealability on three issues: 1) whether the trial court's decision to sustain a crucial defense witness's blanket invocation of his Fifth Amendment privilege denied Davis a fair trial and his right to present a defense, 2) whether Davis's trial counsel provided ineffective assistance by failing to offer into evidence prior exculpatory statements made by a witness who invoked his Fifth Amendment privilege not to testify, and 3) whether the manner in which the prosecutor raised Fifth Amendment concerns about a crucial defense witness amounted to prosecutorial misconduct and intimidation.

## Summary of Facts

Sheila Jones and her two children, seven-year-old Darquelle Ray and four-year-old Shawanna Ray, were murdered on September 26, 1996. Jones was killed in the home of Davis's father, Jimmy Motley, while the children were killed in their own home, down the street from Motley's. Motley, the boyfriend of Jones, was in jail at the time of the murders. Davis, Bell and others were in Motley's home on the evening of September 26, when Motley called to speak with Jones, as he frequently did. Davis went down the street to Jones's home and brought her back to Motley's house, where she was killed later that evening. The children were killed soon thereafter.

Davis and Bell were tried in a joint trial before separate juries. The prosecution's theory of the case was that Davis and Bell cooperated in beating and killing Jones and her children. Davis's theory of the case was that Bell killed Jones and the children by himself and that Davis assisted only in disposing of Jones's body, which Davis admitted doing out of fear of retribution from Bell and his family if he refused. Bell confessed to the murders, but also attempted to incriminate Davis, while Davis maintains his innocence. Most of the witnesses implicating Davis were related to or affiliated with Bell. The record reflects no physical evidence linking Davis to the murders. In Davis's testimony at the trial, he claimed the only person (other than himself and Bell) in the house when Jones was being beaten was then fifteen-year-old Damaris Jourdan.[1]

Jourdan's pre-trial statements strongly tend to exonerate Davis of the murder. He made two statements to police approximately one week after the murders, on October 2, 1996, and October 3, 1996. Both Jourdan's mother and father were present for the first statement, which was not *Mirandized*. In that statement, Jourdan reported witnessing Bell, and Bell alone, beating, "stomping," and grabbing Jones by the neck, both inside the house and in the front yard and finally dragging her from the yard into the garage. Jourdan then reported leaving the area.

The day after his first statement, the police brought Jourdan and his mother back to the station for another interview. This time, they read him his rights "per the Miranda Warning Card, which he stated he waived." His mother was also informed of his rights. They then informed Jourdan that another suspect had implicated him in the crime. After waiving his right to remain silent and to have an attorney present, Jourdan denied any involvement in the murders. He reiterated

---

[1]This name is sometimes spelled "Jordan" in the record.

his statement from the previous day and elaborated somewhat, stating that, just before leaving, he heard Jones breathing in the garage and saw Bell standing nearby holding a black and yellow handled screwdriver. Jourdan reportedly said to Bell, "Leave her alone," to which Bell responded, "She saw my face."

Approximately ten months later, Jourdan gave a statement to a private investigator hired by Davis's defense counsel. This statement, while more detailed, is very consistent with the earlier ones given to police.[2] In addition to the details recited earlier, Jourdan reported that Bell told him that he planned on killing Jones's children (who were still in their home down the street), because they knew where their mother had gone. Bell reportedly attempted to get Jourdan's help in killing the children. Jourdan reported that he refused to help and walked off alone before Jones was killed. He repeatedly told the investigator that neither he nor Davis had hit or stabbed Jones at any time and that Davis was not even outside to witness the violence. His eyewitness account is consistent with Davis's testimony at trial. Jourdan's account exonerates himself and strongly tends to exonerate Davis of murder.

Apparently unaware that either the prosecutor or the trial judge would prompt Jourdan to assert his Fifth Amendment privilege, Davis's defense counsel, Phillip Beauvais, identified Jourdan by name in his opening statement and told the jury to expect to hear him recount the version of events described above. During the trial, after Jourdan was called by the defense and sworn in as a witness, Prosecutor Arthur Busch requested a sidebar. The judge excused the jury and discussed the prosecutor's concerns on the record. Busch informed the court, within earshot of Jourdan, that Jourdan was a suspect in the case and should be informed of his Fifth Amendment rights before he testified. After questioning Jourdan briefly, the judge obtained counsel for him, who spoke with Jourdan and his parents and reviewed relevant documents. On advice of counsel appointed by the judge, Jourdan invoked his Fifth Amendment privilege against self-incrimination and refused to testify. The trial court did not follow the normal procedure of putting the witness on the stand and allowing him to invoke the privilege as to individual questions. *See Hoffman v. United States*, 341 U.S. 479, 486-87 (1951); *In re Morganrath v. Fitzsimmons*, 718 F.2d 161, 167 (6th Cir. 1983). Instead, the court allowed Jourdan not to testify or answer any questions at all, stating "whether or not he testifies is a choice that is his alone under these circumstances." This sparked a heated exchange between Davis's defense counsel and the prosecutor.

> BEAUVAIS: I think what is happening today is that this young man is afraid that if he takes the stand and testifies truthfully and that truthful testimony will help Danta Davis that, in fact, the Prosecutor will then, as retribution for him testifying, will then charge him with a crime. I believe the only reason that this was brought forward at this particular time was to keep this young man from testifying. And I believe that because of that my client is being denied his right to a fair trial and is denied his right to have his witnesses appear, witnesses that can certainly exonerate this person.

> * * *

> BUSCH: This is not an intimidating thing, that is to try and protect the People's right, as well as Mr. Jourdan's right. Quite frankly, if we had our druthers, we would prefer him to testify in this matter because we think it would bring out the truth. But there is no – there

---

[2] The record of Jourdan's statement to the private investigator is in question and answer format, similar to a trial transcript, while the statements to the police are summaries, apparently written by an officer present at the interviews.

is no merit to any allegation that our office somehow is involved in some intimidation of Mr. Jourdan. We have made it clear throughout, since this trial started, to defense counsel that at some point if [Jourdan] was to be summoned that he would need to have counsel and that there should be some discussion of that with this particular individual.

The trial continued without Jourdan's testimony, and both Davis and Bell were convicted and received multiple life sentences. No charges have been brought against Jourdan for the murders.

Davis made a motion for a new trial based, in part, on his objections to the handling of Jourdan's testimony by the prosecutor and trial judge. This resulted in an evidentiary hearing where both defense counsel Beauvais and prosecutor Busch testified regarding their discussions and actions about Jourdan leading up to the trial.

It is undisputed that the prosecutor never charged Jourdan with any participation in the crime. Busch testified that police had notified him that some evidence existed implicating Jourdan in the crime, primarily the testimony of Bell that Jourdan had also stabbed Jones. At the time of Davis's trial, however, Busch did not believe the case was strong enough to pursue charges against Jourdan, although he did allegedly make some additional efforts to develop the evidence after Davis's trial concluded. Busch testified that prior to Jourdan's appearance in court, he had had several conversations with Beauvais, at least once in chambers with the trial judge, wherein he raised his Fifth Amendment concerns and notified Beauvais of the need for Jourdan to have separate representation. Before issuing his order regarding the motion for a new trial, the judge reported that he remembered discussions in chambers about Jourdan before he was called, but could not remember the precise issues raised.

Beauvais repudiated Busch's account and claimed the only conversations they had had regarding Jourdan pertained to possible hearsay objections to his testimony. Furthermore, Beauvais testified that he would not have mentioned Jourdan by name in his opening statement, nor would he have called him to the stand in front of the jury, if the prosecutor or the court had made him aware of potential Fifth Amendment concerns. Jourdan's name appeared on both the defense and the prosecution's witness lists, which were exchanged long before trial. Beauvais, therefore, gave notice to the prosecutor of Jourdan's upcoming appearance and provided ample time for him to notify defense counsel of his concerns prior to opening statements.

The court denied Davis's motion for a new trial finding that defense counsel "knew or should have known - with emphasis on the should have known - that Mr. Jordan [sic] required some treatment outside the presence of the jury before he was called to the stand." It rejected his claim that the prosecutor had acted improperly or in an intimidating fashion by alerting the court of his constitutional concerns.

Davis then appealed to the Michigan Court of Appeals, which held that the trial judge had misstated the law in determining that the witness, not the court, could decide for himself if the privilege applied. Nevertheless, it affirmed the lower court's decision because "the trial court also found that there was a reasonable basis for Jordan [sic] to fear self-incrimination." *See* J.A. at 42 (*State v. Davis*, No. 207725 (Mich. Ct. App. Dec. 26, 2000) (unpublished), citing *People v. Dyer*, 425 Mich.572, 578, 390 N.W.2d 645, 648-49 (1986)).

Davis properly and timely exhausted his claims in state court and then filed this petition for a writ of habeas corpus in federal district court. A magistrate judge issued a report and recommendation denying his petition, which was adopted by the District Court. In the report, the Magistrate Judge found that Jourdan's blanket assertion of the privilege did not provide grounds to

grant the writ because "[e]ven his admission that he was present during the murder, although undisputed and not sufficient in itself to convict him of any crime, would be one link in the chain of evidence establishing his guilty."

**Analysis**

**I.**

Long ago, the Supreme Court held that, for a witness to invoke his Fifth Amendment privilege, the danger of self-incrimination must be "real and probable," not "imaginary and unsubstantial." *Brown v. Walker*, 161 U.S. 591, 608 (1896). This holding has never been overruled. Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), habeas may be granted if a state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." The state court's decision here was contrary to Supreme Court precedent.

As the Michigan Court of Appeals observed, the procedure used by the trial court was improper. We agree with this view of the case. The proper procedure would have been to put the witness on the stand and rule on the questions one at a time. *See Hoffman*, 341 U.S. at 486-87; *In re Morganroth,* 718 F.2d at 167. In this way, the court can address the question of whether the witness has "reasonable cause to apprehend danger" from answering specific questions. Only this approach can balance a defendant's right to present a defense, *see Washington v. Texas*, 388 U.S. 14, 19 (1967), with the privilege against self-incrimination. *See Hoffman,* 341 U.S. at 486 ("The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself – his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified . . . . To sustain the privilege, it need only be evident from the implications of *the question* [asked]. . . that a responsive answer to *the question* or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.") (emphasis added). The Court has cabined the "reasonable cause" standard by stating that the privilege does not extend where the danger is of an "imaginary and unsubstantial character." *See Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (per curiam). We find that, as to his potential testimony exculpating Davis, Jourdan did not have "reasonable cause to apprehend danger" of self-incrimination.

Due to the Court's serious concerns about the inherently coercive and involuntary nature of custodial interrogations, it has established "extraordinary" procedural safeguards to ensure individuals' Fifth Amendment rights are protected when they are questioned by police. *See Miranda v. Arizona,* 384 U.S. 436, 467-68 (1966); *Minnesota v. Murphy,* 465 U.S. 420, 430 (1984). Absent additional coercion or misconduct, an individual's decision to answer questions after receiving and understanding the prescribed *Miranda* warning, is considered not to have been "compelled" and whatever statement is made may be used against that individual in a later prosecution. *See Minnesota*, 465 U.S. at 429-30 ("But if he chooses to answer, his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his decision to do so . . . . [T]he *Miranda* Court required the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it.").

In the instant case, the entire premise for allowing Jourdan to invoke a blanket assertion of his Fifth Amendment rights was his admission that he was present at the scene. The theory is that this fact could have been incriminating; and, therefore, any relevant information he might provide,

even if it was exculpatory, would likewise be incriminating. But Jourdan's post-*Miranda* statement to police, which at the very least included an admission that he was present during the beating of Jones, would clearly be admissible against him were he to be criminally prosecuted for these murders, just as properly *Mirandized* confessions are admissible in subsequent prosecutions against the defendants who made them. *See Miranda*, 384 U.S. at 476-77. Jourdan's mother was present during the second interview, and she was also made aware of his rights. There is no indication that the police exerted any undue influence with respect to his decision not to remain silent. Nor did Jourdan request an attorney at any time. It is unreasonable to assert that disclosure of this well-established, undeniable fact during Davis's trial would have incriminated Jourdan any more than had already been done. As the Supreme Court has said, "where there can be no further incrimination, there is no basis for the assertion of the privilege." *Mitchell*, 526 U.S. at 326.

It is uncontroverted (by Jourdan or anyone else) that Jourdan was present at Motley's house on the evening of September 26, 1996. *See* J.A. at 61 (*Davis v. Straub*, No. 02-CV-73319-DT Mag. Judge Report & Recommendation (E.D. Mich. Aug. 14, 2003) ("It was clear that Jordan [sic] was present at the scene of the crime")). In addition to his three statements (one given after he was *Mirandized*) that admitted his presence, both Bell and Davis reported his presence, as did several others who testified at the trial. There reaches a point where a piece of evidence, which all parties agree is only incriminating in the most minimal and remote way, is so overwhelmingly and definitively established that it cannot be constitutionally used to stonewall introduction of other evidence that is highly exculpatory of a criminal defendant. The Fifth Amendment may not be used in such a mechanistic manner that it subsumes a criminal defendant's Sixth Amendment right to present a defense, merely in order to avoid having a witness testify to a fact that is already clearly established and uncontroverted by the witness in his own previous *Mirandized* statement.[3]

This does not mean that Jourdan would be barred from asserting his Fifth Amendment privilege in response to any question at all. It merely means that admitting his presence at the scene could no longer provide a "reasonable basis to fear self-incrimination." Any damage had already been done by his prior, properly *Mirandized* statements to police. If Jourdan had taken the stand, we do not know for sure whether he would have admitted or denied his presence, testified in accord with his prior statements, or admitted his presence but then invoked the privilege with respect to additional questions. But, unlike cases where the individual invoking the privilege is also the defendant, in the instant case the Sixth Amendment creates a countervailing right in Davis that requires the court to compel Jourdan to respond to questions that raise only "imaginary and unsubstantial risk" of further incrimination. Questions regarding Jourdan's presence at the scene

---

[3]In *Washington v. Texas*, 87 U.S. 14 (1967), the Supreme Court clearly established the Sixth Amendment right to present a defense:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

> . . . .

> We hold that the petitioner in this case was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense.

*Id.* at 19, 23. It is worth noting that the prosecution can easily avoid the self-incrimination problem by giving a witness like Jourdan immunity and calling him to the stand.

fall into this category, and it was a violation of Davis's Sixth Amendment rights not to compel him to respond to them.

It was, therefore, an unreasonable application of Supreme Court case law for the Michigan Court of Appeals to affirm the trial court's decision that Jourdan could avoid any questions because he had a reasonable basis to fear self-incrimination, and invoke a blanket assertion of the Fifth Amendment. If Jourdan had testified in a manner consistent with his prior statements then he would have provided a great deal of relevant, exculpatory (as to Davis), eyewitness testimony that in no way incriminated Jourdan. And if, in order to tell the truth, Jourdan would have had to testify in a manner that was inconsistent with his prior statements (e.g., admitting he stabbed Jones) then he could have properly invoked the privilege in response to specific questions and the trial judge could have evaluated each of his claims in a more particularized and constitutional manner.

Alternatively, a serious additional constitutional problem would arise if, contrary to our holding here, we were to conclude that the penal threat to Jourdan was sufficiently great to allow him to invoke his Fifth Amendment privilege. If we should agree with the Michigan court in that respect, it seems clear that Davis's counsel committed a serious error in failing, after the trial court's ruling, to offer Jourdan's three exculpatory statements in evidence as declarations against penal interest.

After the trial court prevented Jourdan's live testimony, defense counsel's failure to offer these statements, which counsel already had in hand and which strongly tended to exonerate Davis of the murder, surely constituted ineffective assistance of counsel. Had the statements come into evidence, the probability of a different outcome seems great. Jourdan was the only eyewitness other than Davis and Bell. His statements are strongly exculpatory. Counsel's opening statement and primary defense at the trial would have been confirmed as promised rather than remain unheard, unexplained and unproved to the jury. Few trial errors are more devastating to the accused than the failure to offer definitive evidence promised in the opening statement and anticipated by the jury.

The penal interest exception to the hearsay rule is well accepted under the Confrontation Clause, and the Michigan Supreme Court has interpreted the exception broadly. In *People v. Barrera*, 547 N.W.2d 280, 287 (Mich. 1996), the Court held that the phrase "tended to subject" found in the rule, should be read as "includ[ing] a broad scope of inculpatory statements," that includes more than direct confessions and "need only be a 'brick in the wall' of proving the declarant's guilt."

In this case, the Michigan Court of Appeals rejected Davis's ineffective assistance of counsel claim under *Strickland v. Washington*, 466 U.S. 668 (1984), because it found that the failure to offer the statements was not prejudicial to Davis.[4] This ruling is unacceptable. Had counsel offered the statements tending to exonerate Davis, the trial court would have been governed by the broad interpretation that the Michigan Supreme Court has given to the penal interest exception to the hearsay rule. Instead, counsel never presented this documentary evidence to the trial court and never gave the jury an opportunity to consider the three exculpatory statements that were consistent with Davis's testimony and vital to the defense theory of the case. This runs directly counter to the principle announced by the Michigan Supreme Court when it discussed the penal interest exception:

---

[4]The Michigan Court of Appeals' no-prejudice ruling, under state law and under *Strickland*, is purely hypothetical. The court did not review any ruling by the trial court on the penal interest exception because no trial court ever considered the admissibility of these statements. This fact distinguishes the instant case from those under *Estelle v. McGuire*, 502 U.S. 62 (1991), which prohibited federal habeas courts "inquir[ing] as to evidence that was *properly admitted or improperly excluded* under state law." *Johnson v. Karnes*, 198 F.3d 589, 593 n.3 (6th Cir. 1999) (emphasis added).

[T]he defendant's right to present exculpatory evidence in his defense and the rationale and purpose underlying [the against penal interest exception,] of ensuring the admission of reliable evidence must reach a balance. We believe they may be viewed as having an inverse relationship: the more crucial the statement is to the defendant's theory of defense, the less corroboration a court may constitutionally require for its admission.

*Barrera*, 547 N.W.2d at 291.

Considering the facts of this case, the prosecution cannot have it both ways. It is unreasonable to claim both that Jourdan's testimony about what he witnessed threatened his penal interest to such a degree that it triggered the Fifth Amendment, while at the same time claiming that the statements were inadmissible as declarations against his penal interest. The two arguments are mutually inconsistent, especially when one considers the extent to which Davis's Sixth Amendment rights are also at stake. The prosecution's arguments are designed simply to prevent the jury from hearing the persuasive testimony of the only eyewitness in any form, either from the stand or in the form of written evidence. The effect of these arguments, which were accepted by the Michigan Court of Appeals, was to violate Davis's right to mount a defense or, in the alternative, to receive the effective assistance of counsel in doing so.

## II.

In *Webb v. Texas*, 409 U.S. 95, 98 (1972), the Supreme Court established a standard for finding a constitutional violation for witness intimidation: "the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." The following year, we applied *Webb* to a case where the prosecutor sent a Secret Service agent to communicate *ex parte* with a potential witness and threaten prosecution if he testified. "[T]he Government's action here substantially interfered with any free and unhampered determination the witness might have made as to whether to testify and if so as to the content of such testimony." *United States v. Thomas*, 488 F.2d 334, 336 (6th Cir. 1973). The prosecutor's conduct in the instant case simply does not rise to the level of intimidation present in *Webb* and *Thomas*. Here, the prosecutor requested a sidebar with the judge, wherein he informed the court that the witness was a suspect and should be informed of his constitutional rights. The judge then proceeded to briefly question the witness and quickly appointed independent counsel to advise him of his rights. Neither the prosecutor's nor the judge's conduct was unconstitutional, especially considering the ethical obligation, imposed on prosecutors by the ABA's model guidelines, to

advise a witness who is to be interviewed of his or her rights against self-incrimination and the right to counsel whenever the law so requires. It is also proper for a prosecutor to so advise a witness whenever the prosecutor knows or has reason to believe that the witness may be the subject of a criminal prosecution.

ABA Standards for the Administration of Criminal Justice § 3-3.2(b).

Regardless of the prosecutor's motives or the propriety of waiting until the witness was called to the stand to inform the court of his concerns, we cannot say that the Michigan Court of Appeals unreasonably applied Supreme Court precedent in its holding that the prosecutor did not intimidate Jourdan into invoking the privilege.

**Conclusion**

Accordingly, the judgment of the District Court is REVERSED and the cause is REMANDED with instructions to issue a conditional writ of habeas corpus requiring petitioner Davis to be released unless a new trial is initiated within one-hundred eighty days.

---

### CONCURRING IN PART, DISSENTING IN PART

---

ROGERS, Circuit Judge, concurring in part and dissenting in part. Like the majority, I am troubled that in this case the jury did not hear eye-witness testimony that may well have strengthened Davis's case. Yet, under the limited review permitted by AEDPA, 28 U.S.C. § 2254 (2005), I am simply unable to conclude that the Michigan Court of Appeals' decision was contrary to, or an unreasonable application of, Supreme Court law. While I concur in Part II of the majority opinion, holding that no unconstitutional intimidation by the prosecution occurred, I respectfully dissent from the majority's holding that the state courts acted contrary to established Supreme Court law, either by permitting a witness to give a blanket assertion of his Fifth Amendment right against self-incrimination, or by finding no ineffective assistance of counsel when defense counsel failed to offer the same witness' prior out-of-court statements as declarations against interest.

The witness Jourdan invoked his Fifth Amendment right not to testify, after consulting with independent counsel, and without (as the majority agrees) unconstitutional intimidation by the prosecution. The trial court did not require Jourdan to take the stand and invoke his right in response to each question. The only way to hold that this procedure was "contrary to" established Supreme Court law is to determine that Supreme Court case law requires defense witnesses invoking the Fifth Amendment right against self-incrimination to take the stand and invoke the right on a question-by-question basis.

Such a rule doubtless has merit, *see In re Morganroth*, 718 F.2d 161, 167 (6th Cir. 1983), although it could be argued that the trial court should have discretion to permit blanket invocation of the right in appropriate circumstances.[1] But neither the petitioner nor the majority has cited a Supreme Court case holding that such a procedure is required for the benefit of criminal defendants.

The majority relies upon *Hoffman v. United States*, 341 U.S. 479, 486-87 (1951), but that case states no rule proscribing a blanket assertion of the privilege. In fact, *Hoffman upheld* the invocation of the privilege as to very preliminary questions. The opinion in Hoffman does state at one point, "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." 341 U.S. at 486-87. In context, the Court may have been simply admonishing trial courts to use their good judgment when determining whether a responsive answer would tend to incriminate the witness. *Id.* at 486. The sentence by its terms, and certainly in context, does not necessarily imply—and clearly does not hold—that defense witnesses must always take the stand in order to invoke the privilege. Indeed, the Court immediately followed by saying: "The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'" *Id.* at 487 (citing *Ex parte Irvine*, 74 F. 954, 960 (C.C.S.D. Ohio 1896) (Taft, J.)).

---

[1]Defendant suggests that the first question for Jourdan would have been: "Were you present?" A strong case can be made that such an initial question could properly warrant invocation of the privilege. *See Hoffman v. United States*, 341 U.S. 479 (1951). If so, it is arguably a pointless formality, within a trial court's discretion to forgo, to insist that the witness take the stand.

It is true that our circuit in *Morganroth*, *supra*, stated as follows:

> A blanket assertion of the privilege by a witness is not sufficient to meet the reasonable cause requirement and the privilege cannot be claimed in advance of the questions. The privilege must be asserted by a witness with respect to particular questions, and in each instance, the court must determine the propriety of the refusal to testify. *See Hoffman,* 341 U.S. at 486-88.

718 F.2d at 167. The issue resolved in *Morganroth*, however, was not whether the invocation of the privilege required that the witness to take the stand. The witness in that case had in fact taken the stand. Instead, the issue was whether the witness "must supply personal statements . . . or . . . evidence with respect to each question propounded to him to indicate the nature of the criminal charge which provides the basis for his fear of prosecution" in the particular context of possible incrimination for perjury. *Id.* at 169. Such a requirement was warranted where the witness feared incriminating himself of perjury by giving testimony inconsistent with prior sworn testimony, because "the incriminating nature of the answer is not evident from the implications of the question in the setting in which it is asked[.]" *Id.* Not only is this a different issue, but also the issue was raised in the context of an appeal by a witness from an order directing him to testify, not in the context of a criminal defendant's right to present testimony. The statement in *Morganroth* about blanket assertions and particular questions is thus at best dictum with respect to the issue presented in this case: whether a criminal defendant has a due process right to invoke the Fifth Amendment without taking the stand and responding to individual questions, regardless of the circumstances. In any event, AEDPA calls for us to interpret clearly established federal law, "as determined by the Supreme Court of the United States," not the United States Courts of Appeals. Indeed, the Supreme Court has considered that a state court may disagree with the law of its federal circuit: "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The Supreme Court's decision in *Washington v. Texas*, 388 U.S. 14 (1967), also fails to warrant a grant of habeas corpus under AEDPA. It is true that, entirely outside the Fifth Amendment self-incrimination context, *Washington v. Texas* clearly established that, under the Sixth Amendment, a state may not arbitrarily deny a defendant the right to call a witness whose testimony is relevant and material to the defense. *Washington*, 388 U.S. at 19. The Michigan Court of Appeals' decision, however, was neither contrary to nor an unreasonable application of *Washington v. Texas*.

*Washington v. Texas* does not hold that a defendant has the right to present any and all witnesses. The Court addressed the limits of a defendant's right to call witnesses and held that a state cannot create "arbitrary rules that prevent whole categories of defense witnesses from testifying on the basis of *a priori* categories that presume them unworthy of belief." *Id.* at 22. The Court proceeded to hold that Texas' rule against allowing purported accomplice testimony was an "absurdity." *Id.* Because the Court did not consider the question of a witness's Fifth Amendment privilege against self-incrimination anywhere in its opinion, it cannot be said that the Court created clearly established law against a blanket assertion of the privilege in that case. *See id.* at 23 n.21 ("Nothing in this opinion should be construed as disapproving testimonial privileges, such as the privilege against self-incrimination . . . , which [is] based on entirely different considerations from those underlying the common-law disqualifications for interest.").

This leaves only one remaining basis for granting the writ—that Davis received ineffective assistance of counsel when defense counsel failed to try to introduce Jourdan's prior unsworn statements into evidence. Constitutionally ineffective assistance of counsel requires both that defense counsel's services fell below that of a reasonably competent attorney and that the deficiency

prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish prejudice, it would be necessary to show that Jourdan's prior unsworn statements were admissible. But the contrary was held by the Michigan Court of Appeals, which determined as a matter of state evidence law that Jourdan's prior statements would not have been admissible in any event. *See People v. Davis*, No. 207725, 2000 WL 33385391, at *3 (Mich. Ct. App. Dec. 26, 2000) (per curiam) ("[The statements] do not qualify as statements against penal interest for purposes of MRE 804(b)(3)."). We are bound by the state court's determination of its own law. *Hutchison v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984); *see also Vroman v. Brigano*, 346 F.3d 598, 604 (6th Cir. 2003); *Israfil v. Russell*, 276 F.3d 768, 771 (6th Cir. 2001); *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986). Because we cannot logically grant the writ based on ineffective assistance of counsel without determining that the state court erred in its interpretation of its own law, we are constrained to uphold the district court's denial of the writ.

Finally, a different result is not required by the asserted tension between a constitutional holding that a witness may not be required to testify for fear of providing an incriminating statement and a state-law evidentiary holding that prior statements by the same witness were not admissible as statements against penal interest. The majority cites no authority for the proposition that these determinations are legal mirror-images of each other, and certainly the Supreme Court has not so held as a matter of constitutional law.

I therefore reach the conclusion that under AEDPA the writ was properly denied.